UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:19-cv-00491-RJC-DCK

| | |
|---|---|
| AZUCENA ZAMORANO ALEMAN, *individually and as Administrator of the Estate of* RUBIN GALINDO CHAVEZ<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF CHARLOTTE and DAVID GUERRA, *individually and officially*,<br><br>Defendants. | <u>ORDER</u> |

**THIS MATTER** comes before the Court on Defendants David Guerra's and City of Charlotte's Motions for Summary Judgment, Plaintiff's Responses, and Defendants' Replies (Doc. Nos. 27, 29, 37, 38, 40 and 41 respectively), and Plaintiff Azucena Zamorano Aleman's Motion for Partial Summary Judgment, Defendants' Joint Response, and Plaintiff's Reply (Doc. Nos. 30-33, 35 and 39).

These matters have been fully briefed and orally argued. The Court has reviewed the pleadings, exhibits thereto, and applicable law. The parties have been fully heard. For the reasons stated herein, Defendants' Motions for Summary Judgment are **GRANTED**, and Plaintiff's Motion for Partial Summary Judgment is **DENIED**.

**I. BACKGROUND**

After dark, sometime shortly after 9:00 p.m., on September 6, 2017, Ruben Galindo made the first of two 911 calls from his cell phone. He was then located in the Hunter Pointe Apartment Complex at 1918 E. Prospect Avenue, Unit E. Sadly, these calls would lead to a series of events

culminating in his death approximately one-half hour later.

An event chronology (31-2[1]), "Armed Person Call for Service" document (31-4), and English transcripts of the two calls (31-5,6) were submitted by the Plaintiff. In the first call, Galindo asked the police to come help him and, after apparently speaking with someone in the background, provided his address. He did not know his phone number. Galindo said he had a gun in his hand. When asked what he was going to do with the gun, he responded "are you going to help me or are you not going to help me?" When asked if he was homicidal or suicidal, he answered "can you or can't you [help me]?" In response to a question as to whether he planned to kill himself or someone else, he answered "I want to turn myself in." He identified himself as "10 star" and "see el dios Estrella" (the star god). He indicated "they" were looking for him. He admitted he had been drinking beer but denied using drugs that day.

Galindo repeated that he needed the police to come for him. He then stated that he would be outside the apartment, and that he was a thirty-year-old Hispanic wearing a white shirt and blue pants. He denied wanting to harm the officers and said he just wanted them to come for him, that he wanted to turn himself in, and that he could not take it anymore.

The call was abruptly ended. The dispatcher unsuccessfully tried to reconnect several times. When Galindo called a second time, he identified himself as "Ruben" and indicated he had a gun in a bag. The dispatcher told him in Spanish to leave the gun in the apartment. (Complaint, 1-2, ¶ 23). The dispatcher also told him that when the officers arrive, he should "show your hands, I don't want you to have the firearm." Galindo responded "ok."

The dispatcher then asked if he had put the gun in a safe place and he said "No, I have it with me." The dispatcher said "No, please, no, no please . . . ." Over apparent giggling, Galindo

---

[1] 31-2 refers to the source at Docket #/Exhibit #. This convention is used throughout this Order, sometimes followed by page number.

indicated it did not have bullets.  The dispatcher said again: "But please leave it, continuing "for your safety and of everyone's."  A fifth time the dispatcher referenced leaving the gun: "I need you to assure me that you will leave the gun please."  In response, Galindo told the dispatcher that as long as the police did not shoot him, he would throw them the gun.  He repeated several times that he did not have bullets.  Again, and for the sixth time, the dispatcher instructed him to put the gun somewhere, "please."  Galindo said that the dispatcher was not helping him.  He responded that he had the gun.  The last word he spoke to the dispatcher was "can you help me or not?"

The dispatcher relayed to responding officers that the caller was armed with a gun and wanted officers to help him.  She indicated that he refused to give further information and that it was unknown what he wanted to do with the gun or whether he was homicidal or suicidal.  But she noted that he wanted to turn himself in for an unknown reason or warrant.  As officers were dispatched, they learned that only one previous call for service had occurred at that address (larceny from auto) and there was no call history from the phone he was using.  They were informed that Galindo referred to himself as "see el dios Estrella" and that he had been drinking; that a female had been heard in the background, but that it was unknown how many people were in the apartment; and that they should "use caution" because Galindo "sounds delusional."  They were also told the complainant's name, date of birth and clothing description, and that dispatch had called back complainant repeatedly and got only voicemail.  Officers were advised that in a follow-up conversation, Galindo told the dispatcher that the gun had no bullets.  The call was registered in terms of priority as a two on a one to nine scale, with one being the most serious.  The call had their full attention because of the weapon and the refusal to leave the weapon somewhere safe or inside the home.  (32-1, p 84).

In preparation for responding to the scene, officers met in a school parking lot behind the

North Tryon Division station and discussed safety issues including concerns over a possible ambush. Officer Batson researched Galindo's name and discovered that Galindo had been arrested recently for assault for pointing a gun. Batson remembered responding to that call for service as a backup officer.

Meanwhile, a dispatcher requested a Spanish interpreter but no one from the division "rogered up." (Guerra Dep., 32-1, p. 68). It was believed that an "outside division" interpreter was on his way but might take anywhere from 5 to 30 minutes. The officers also received information that the dispatcher had heard a female in the background of the 911 call and that an unknown number of people were in the apartment, suggesting a possible volatile domestic situation. When combined with known facts—that Galindo was armed, had been drinking, expressed delusional thoughts, was of unknown mental state, and was described as "uncooperative" with the dispatcher—officers assessed they could no longer wait. (32-1, p. 76-78).

An approach plan was formulated. Officers Tran-Thompson and Guerra would make initial contact with Galindo from a distance. They both carried CMPD-issued patrol rifles, which they were certified to use. Officers Batson and Suggs were designated to make "hands on" contact with Galindo once it became safe to do so. The officers positioned themselves near the corners of building 1920 so they could view apartment 1918-E from different angles behind cover. Officers Guerra and Tran-Thompson took up staggered positions on the left side of the building in front of Galindo's apartment. Officers Suggs and Batson took up positions on the right side of the apartment building in front of Galindo's. (*See* Aerial photo, 28-11). As they were approaching, they checked the bushes and corners to fend off any potential ambush.

This Court accepts Plaintiff's request pursuant to *Scott v. Harris* to consult the body worn

camera ("BWC") video footage (31-1) to determine what happened next. 550 U.S. 372, 378–81 (2007). Although the parties' descriptions of what is contained in the video imparts their respective gloss, the Court finds that the composite video reflects what Officer Guerra had the opportunity to perceive on the night he shot Galindo.[2]

In the BWC footage, the officers announce they are police. Guerra can be heard yelling out "manos, manos" (hands, hands) as Galindo came out the door with his right arm initially hidden from view behind the door frame and his left hand empty. Galindo then reached his left hand down to his left pocket and pulled out a gun (the firearm is depicted in 28-14). As officers yelled "put it down" and "drop the gun, drop the gun," Galindo raised the gun half-way up to shoulder height and lowered it again. As officers continued to yell "put it down" and "drop the gun," Galindo raised his left arm then his right arm above shoulder height. At this point it can be seen from the Batson/Suggs angle that Galindo is holding the firearm upside down, but from the Trans-Thompson BWC footage, the same cannot be said. Galindo's left hand began to drop just before shots were fired. (31-1: between seconds 23 and 24 and seconds 38 and 39). Once hit, both of his arms came fully down as he fell to the ground. The time between the first scream of "manos" to the firing of the first shot was approximately six seconds.

## II. LEGAL FRAMEWORK

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

---

[2] Although the Court relies on the video footage (31-1), conducting its examination of evidence in a light most favorable to Plaintiff, it does so with three caveats. First, unless expressly indicated, the Court does not embrace the Plaintiff's sometimes hyperbolic characterizations of what is contained in the video footage. For example, repeatedly, Plaintiff characterizes the video footage as "blatantly contradicting" Guerra's deposition and interview statements. Second, the Court notes that the combined footage would include angles of observation unavailable to Officer Guerra. For example, the video footage from the Batson/Suggs BWCs is from a different angle on the opposite side of building 1920 (*see* aerial photo, 28-11)). It would not reflect what Guerra could have seen from his position on the opposite side. Guerra's BWC footage was substantially obscured by the building that provided him cover, but the footage from Trans-Thompson's BWC would most accurately capture the scene as Guerra would have experienced it. Third, Guerra's view was split-second and of course not subject to slow-motion or replay.

5

as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. *Id.*

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. *Id.* at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In ruling on summary judgment, courts are allowed to consider video evidence capturing the actions of officers in qualified immunity cases. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 376 (2007).

6

The doctrine of qualified immunity "balances two important interests," namely, the need to hold accountable public officials who exercise power irresponsibly, and the need to shield officials who perform duties responsibly from "harassment, distraction, and liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of establishing the affirmative defense of qualified immunity rests on the party seeking to invoke it.

Ever since *Graham v. Connor* was decided in 1989,[3] claims that law enforcement officers used excessive force are "analyzed under the Fourth Amendment and its 'reasonableness' standard." 490 U.S. 386, 395 (1989). The standard of review is an objective one, the intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force. *Id.* at 396–97. A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

A court may not employ "the 20/20 vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97. The Constitution is not blind to "the fact that police officers are often forced to make split-second judgments." *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014). The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection. *Greenidge v. Ruffin*, 927 F.2d 789, 791–92 (4th Cir. 1991).

### III. ANALYSIS

"No citizen can fairly expect to draw a gun on police without risking tragic consequences.

---

[3] The facts of *Graham v. Connor* occurred not ten miles from the facts involved in this case.

And no court can expect any human being to remain passive in the face of an active threat on his or her life." *Elliott v. Leavitt,* 99 F.3d 640, 644 (4th Cir. 1996). These fundamental propositions undergird the common sense result reached in this tragic case—Defendants bear no civil liability for shooting Rubin Galindo in these circumstances.

### A. 42 U.S.C. § 1983 Claim

Plaintiff has alleged that Defendant Guerra used unreasonable and excessive force in violation of Rubin Galindo's Fourth Amendment rights. Defendants deny the allegation and, in addition, defend on the basis of qualified immunity. "Qualified immunity shields federal and state officials from money damages unless the facts show (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Mays v. Sprinkle*, 992 F.3d 295 (4th Cir. 2021) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The court may address these questions in either order. *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst,* 810 F.3d 892, 898 (4th Cir. 2016) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Whether excessive force was used is an objective inquiry assessing what a "reasonable officer on the scene" would have done, taking into account the *Graham* factors. Those factors include the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect actively resisted arrest or attempted to evade arrest by flight.[4] *Graham*, 490 U.S. at 396–97. This evaluation is guided by the pragmatic considerations of the moment and not subject to armchair analysis. *Id.*

---

[4] Based on the facts of this case, the third *Graham* factor holds little weight as the officers had no opportunity to arrest Galindo, nor did Galindo attempt to flee before he was shot. Thus, the Court will not specifically address this factor any further.

8

### i. Severity of the Crime

The events of the night in question were triggered by 911 calls placed by Galindo himself. He wanted to turn himself in for unknown reasons, and indicated he possessed a gun that he would give to police officers. He also indicated in the phone call that he had been drinking[5] and expressed delusional thoughts that he was the sun god and that "they" were following him. In researching Galindo, officers became aware of a prior arrest for assault by pointing a gun. Although officers were not responding to a specific crime, the situation made them wary about whether Galindo was suicidal or homicidal, and whether they were being lured into a trap or ambush.

There is no dispute that Galindo was repeatedly instructed in Spanish to leave the gun inside, in a safe place, but not to take the gun out to meet the officers. He ignored those instructions just as he ignored the instructions from the officer saying "manos" and "put the gun down." Although Plaintiff argues that he was compliant with the officer's instructions, even taking the evidence in a most favorable light, it is hardly compliant to reach into a pocket and retrieve a gun—after repeatedly being told to leave the gun inside—while the police are asking to show your hands. It is provocative and makes an already "tense, uncertain and rapidly evolving" situation worse.

### ii. Whether the Suspect Posed an Immediate Threat to the Safety of the Officers or Others

This factor is obviously the critical factor. For, if at the moment Galindo was shot, he posed an immediate threat to officers and others, then Officer Guerra's actions were objectively reasonable. Conversely, if Galindo did not pose an immediate threat, Plaintiff would be entitled to partial summary judgment or at the least a right to a jury trial.

A close look at the facts relevant to this factor involves some repetition. At the moment Officer Guerra pulled the trigger expelling the fatal bullet toward Galindo, the responding officers

---

[5] The postmortem toxicology report registered .23 BAC. 28-17.

were aware of the following facts. They knew that Galindo had placed two 911 calls communicating that he wanted to turn himself in for some unknown (to them) reason. He also said he had a gun, that he said was not loaded, and that he wanted the police to help him. He had been drinking and expressed delusional thoughts that caused the dispatcher to recommend "caution." The officers also knew that there was at least one other person in the house with Galindo, a female, and they were concerned about the possibility they were responding to a potentially volatile domestic situation. And as stated before, they worried about Galindo's mental state and whether he was homicidal or suicidal. As they approached, they were aware that they were responding to a gun related call to an apartment in the middle of a complex that housed somewhere between 200 to 400 residents. It was a weeknight, it was dark, and at a time (just after 9:00 p.m.) when people might be around. In fact, they passed a woman walking a dog on their way. Bushes were scoured because of a concern they might be walking into an ambush.

These undisputed facts would raise serious and legitimate safety concerns to any reasonable officer in Guerra's shoes. But they were not the most serious of the concerns that night. Galindo had been instructed six times in Spanish to leave his gun inside. When he came out, the first command was "manos," Spanish for "hands." Instead of displaying his hands, he reached into a pocket for a gun. Then he raised his hands, lowered them, and raised them again—all while holding the gun.

The video footage depicts the scene on the back porch in the six seconds between the first "manos" command and the fatal first shot. It represents combined footage, some footage from Officer Guerra's vantage point and some from where Officers Batson and Suggs stood on the other side of a house. (*See* Aerial photo, 28-11). The latter is a view that cannot be the view of a reasonable officer in Guerra's position. Nor could such a person have the benefit of slow-motion

10

or replay.

The split-second decision-making confronting Guerra and thus any reasonable officer in his position, takes into account all that can be seen and heard on the video footage, and all that led up to that moment. It leads this Court to the conclusion that a reasonable officer in Guerra's position would have been justified in perceiving an imminent threat. This is so even though the facts are taken in a light most favorable to the Plaintiff: that is, Galindo was subjectively intending to surrender himself and his unloaded firearm to police officers and hoping they would not shoot him.

Galindo's hopes and subjective decision-making do not control the result here because they could not be known to law enforcement. Or if known, could not be relied upon with any certainty. Nor does Guerra's account control the outcome for it is an objective test: neither what was in the mind of Galindo or Guerra is determinative, except insofar as the effect either would have on a reasonable officer. The reasonableness test is objective, and this horrendous set of facts justifies the use of deadly force in the face of an imminent threat. The line is folksy but true: an action is quicker than a reaction. A reasonable officer in Guerra's position did not have to wait; did not have to trust a man believed to be delusional, and possibly homicidal or suicidal; a man who had refused every law enforcement directive aimed at keeping him and others safe. "[The Fourth Circuit] has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Anderson v. Russell*, 247 F. 3d 125 (4th Cir 2001).

These facts are not in dispute. Taking evidence in a light most favorable to a non-moving party does not mean the court is justified in ignoring unfavorable facts. Galindo's series of poor decisions—drinking to excess while possessing and carrying a .380 semi-automatic handgun,

11

executing a bad plan of surrender, and exhibiting a complete inability or unwillingness to heed safety suggestions or law enforcement commands—all combined to create "the tense, uncertain and rapidly evolving" circumstances which required split second officer decision-making of a kind that case law on qualified immunity instructs district courts not to second guess. Courts are also instructed to focus "on the circumstances at the moment force was used and on the fact that officers on the beat are not afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

It is quite telling that in neither the complaint,[6] nor in the Plaintiff's expert report does she deal with the single most compelling fact: Galindo's reaching into his pocket and pulling out a gun in response to officer's repeated commands of "manos." In fact, while complaining that the Defendants' "shared recitation" failed to address "the core uncontested and unsettling fact of this case—[that Galindo] had his hands and arms raised in surrender," and that "Galindo had complied as ordered, four times in Spanish to raise his hands ("manos!")"— it is remarkable that the Plaintiff failed to address the core uncontested and most probative fact of this case—that Galindo ignored the directive to leave the gun in the house and in response to the officer's command "manos," reached into his pocket and drew a gun. Even assuming in a light most favorable to the Plaintiff that this was done in an ill-conceived attempt at surrender, it could hardly be more provocative. The fact that it is not addressed from beginning to end of this action speaks volumes to the insufficiency of the attack on qualified immunity on these facts.

Much ink is spilled in Plaintiff's papers on disputed facts which are not material given the qualified immunity standard. The Plaintiff repeatedly asserts that the BWC footage "blatantly

---

[6] The Complaint in paragraphs 38-41, describes the events from the first command "Rubin manos" to the English command "drop the gun" without any hint that there is a gun, much less that the gun had come from Galindo's pocket or that he had reached into that pocket after the command "manos" to pull the gun out.

12

contradicts" the other evidence in the case and especially the deposition testimony of Officer Guerra. She asserts that the video footage requires rejection of Defendants' summary judgment motions and the granting of her own. But that footage does no such thing. To the extent there is discrepancy between Officer Guerra's testimony and the video footage, the Court relies on the video footage especially that taken by Officer Trans-Thompson's BWC which captures the imminent threat to officers and others that a reasonable officer in Guerra's position would have faced in confronting a non-compliant, armed subject in the totality of circumstances just described.

This Court's conclusion that Officer Guerra did not violate Galindo's statutory or constitutional rights is amply supported by Fourth Circuit case law. In *Anderson v. Russell*, the Fourth Circuit set aside a jury verdict in favor of a plaintiff on the issue of excessive force, concluding that the defendant officer's use of deadly force was reasonable to protect himself against a perceived immediate threat. 247 F. 3d 125, 130 (4th Cir. 2001). There a police officer was justified in using deadly force when a subdued suspect lowered his hands toward what the officer perceived to be a gun, in violation of the officer's verbal commands. *Id.* at 130–32. Even though the suspect was merely trying to turn off his Walkman, the Fourth Circuit observed that "[a]ny reasonable officer in [the officer's] position would have imminently feared for his safety and the safety of others." *Id.* at 131. It is interesting to note that, like Galindo, Anderson initially complied with commands to raise his hand but then reached for his left pocket. Believing Anderson was reaching for his weapon, the officer shot him three times. Anderson argued that a triable issue of fact existed regarding the precise positioning of Anderson's hands and the speed at which he was lowering his hands at the time he was shot. The Court found that any discrepancies between the officers' testimony and that of another witness about the positioning and speed at which Anderson was lowering his hands did not raise an issue of triable fact.

13

> The evidence establishes that immediately before Russell fired, Anderson was reaching toward what Russell believed to be a gun. Any reasonable officer in Russell's position would have imminently feared for his safety and the safety of others.

Id. at 131.

Likewise, *Sigman v. Town of Chapel Hill* presented a comparable situation in which the decedent's actions created a situation that was "tense, uncertain and rapidly evolving." 161 F.3d 782, 787 (4th Cir. 1998) (quoting *Graham*, 490 U.S. at 396–97). The Fourth Circuit upheld the district court's grant of qualified immunity in a case where the decedent was shot after a stand-off with police precipitated by a 911 caller complaining that her boyfriend had been drinking, was out of control, may have a knife and that she wanted police to calm him down. Police presence had the opposite effect on the decedent who engaged in threatening comments before coming out of the house armed with a knife and was subsequently shot. Factual disputes were alleged concerning whether the decedent was armed and how close he had gotten to police before he was shot. Nevertheless, the Court affirmed the grant of qualified immunity. Factors the court considered included the officer's prior knowledge of decedent's drinking, his erratic and threatening behavior, and the fact that he ignored the officer's commands. *Id.* at 787. "It is undisputed that the atmosphere was volatile and threatening. These circumstances are exactly the kind that a qualified immunity analysis requires us to consider." *Id.* (quoting *Graham*, 490 U.S. at 396–97; *Elliott*, 99 F.3d at 642).

In *Slattery v. Rizzo*, Justice Powell, sitting by designation, authored an opinion reversing a district court's refusal to grant qualified immunity to an officer who during a drug "sting" operation shot a passenger in a car who had refused to show his hands at the officer's command. 939 F.2d 213, 214–15 (4th Cir. 1991). The officer could not see Slattery's left hand clearly and mistakenly thought he was holding a gun when in fact his hand was around a beer bottle. *Id.* at 215.

14

Nonetheless, the Court held that "a reasonable officer could have had probable cause to believe that the appellee posed a deadly threat and therefore would be authorized to use deadly force. *Id.* at 216–17.

Although not a published Circuit court case, *Knibbs v. Momphard* is instructive. There, the district court granted summary judgment on an officer's claim of qualified immunity. No. 1:19-cv-130, 2020 WL 6528860, at *5, 11 (W.D.N.C. Nov. 5, 2020). Officers responding to a disturbance call heard a shotgun being "racked" on the other side of a window and commanded the possessor to "put it down" several times. *Id.* at *3–4. When the subject did not comply, fearing for his life, the officer shot six times killing the decedent. *Id.* at *4. Plaintiff argued that a dispute of facts existed based upon whether the decedent's gun was pointed at the deputy or at the ceiling, claiming that the physical evidence opined on by plaintiff's forensic expert "wholly contradicts [the officer's] imagined version of the events." *Id.* at *7. In finding qualified immunity, the court disagreed reasoning:

> First, the possibility of confusion or misperception by an officer who then applies deadly force in part based on his confusion or misperception need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the information available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced. In other words, even assuming that Deputy Momphard misperceived that Knibbs' gun was pointed directly at him, and assuming that, in fact, the gun was pointed more toward the ceiling, Deputy Momphard did not have to detect that Knibbs was actually aiming and pulling the trigger before Deputy Momphard used deadly force to protect his own life.

*Id.* at *8 (internal quotations and citations omitted); *see also Elliott*, 99 F.3d at 644.[7]

The cases cited by Plaintiff do not alter this analysis. In *Hensley v. Price*, officers were

---

[7] "[T]he Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection." *Elliot*, 99 F.3d at 644.

15

Case 3:19-cv-00491-RJC-DCK   Document 50   Filed 09/30/21   Page 15 of 20

responding to a domestic call in the middle of the day and were approached by a man holding a gun at his side. 876 F. 3d 573, 578–90 (4th Cir. 2017). They shot him. *Id.* The Fourth Circuit found that the district court had not clearly erred in holding that qualified immunity was not available as a matter of law where the jury could find that decedent was shot "only because he was holding a gun." *Id.* at 582. Judge Agee makes it explicit that two factors controlled:

> Hensley's altercation with Ferguson had concluded by the time he walked off the porch; therefore, because he never raised his weapon toward the Deputies, he was not immediately threatening to anyone at the scene. Second, the plaintiffs argue that the Deputies' actions were all the more unreasonable here because they shot without warning Hensley to drop the gun or communicating with him in any way.

*Id.* But these facts are readily distinguishable from the instant case. In *Hensley*, officers issued no commands. Here, Galindo ignored directives in Spanish to leave the gun inside, to show "hands," and ultimately to "drop the gun." The instant shooting for the reasons previously detailed involved much, much more than simply "holding a gun." The *Hensley* Court went out of its way to distinguish the holding in *Hensley* from those of two previous Fourth Circuit cases, *Anderson* and *Slattery*:

> In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts.

*Id.* at 585. This case is akin to *Anderson* and *Slattery*, not *Hensley*.

In *Cooper v. Sheehan*, the plaintiff was shot by deputies who tapped on his door but did not announce who they were. 735 F.3d 153, 154–56 (4th Cir. 2013). Cooper peered out a window, and upon seeing no one picked up his shotgun and went outside to investigate. *Id.* As Cooper stepped out onto his porch, the officers seeing his shotgun pointed down commenced firing at him without any warning. *Id.* The Fourth Circuit affirmed the lower court's denial of qualified

16

immunity. *Id.* at 160. But they did so citing approvingly the district court's caveat:

> The court acknowledged that if Cooper had stepped onto a dark porch armed despite knowing law enforcement officers were approaching his door, that certainly could affect a reasonable officer's apprehension of dangerousness. Critically, however, the court determined that no reasonable officer could have believed that Cooper was aware that two sheriff deputies were outside when he stepped onto the porch.

*Id.* at 157 (internal quotations and citations omitted).

In the instant case, a reasonable officer in Guerra's position would have known not only that Galindo knew officers were present but also that Galindo had been told to leave his gun inside and show hands but had instead reached for a gun. In addition, unlike in *Hensley*, where the officers fired without issuing a command, Galindo was told repeatedly by officers to show hands and to put the gun down.

Finally, in the unpublished case cited by Plaintiff, *Pena v. Porter*, a pair of officers searching for a fugitive came to Pena's door late at night but did not identify themselves. 316 F. App'x 303, 305–09 (4th Cir. 2009). Pena awoke to the sound of his dogs barking and, with no knowledge that the police were outside, opened his door while holding a rifle pointed toward the ground. *Id.* at 310–11. One of the officers saw the firearm and immediately fired two shots that struck Pena. *Id.*

The Fourth Circuit found that, under the circumstances, Pena had a "perfectly reasonable" rationale for holding the rifle, which "should have been apparent to the officers at the time of the shooting." *Id.* at 312. The court then explained that Pena's rights had been violated because "[a]bsent any additional factors which would give the [officers] probable cause to fear for their safety or the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force." *Id.* As should be obvious by now, this Court does not perceive the instant case to be a "failure to announce" and/or "mere presence of a weapon" case but rather one that bore all

17

the indicia of facts justifying qualified immunity.

### B. State-Law Negligence, Wrongful Death, Assault and Battery, and Punitive Damages

The Court incorporates its analysis concerning the reasonableness of Defendant Guerra's actions in the previous section and grants summary judgment here on the state law claims based upon the conduct of Guerra and concomitant civil liability. With respect to Plaintiff's claim of negligence/wrongful death, it is the same standard as applied to a claim of wrongful use of deadly force under Section 1983. The other claim of negligence, Infliction of Emotional Distress, is predicated on a finding of negligence on behalf of the Defendant. Finally, a claim of assault and battery is unavailing where the court has found as a matter of law that Defendant Guerra's conduct was justified and reasonable. In the absence of a showing of negligence, much less willful or wanton conduct, the claim for punitive damages fails.

### C. Negligent Training

Plaintiff asserts a claim of negligent training against the City, alleging:

- the City had a duty to train officers to respond reasonably to situations where individuals call the police to ask for help;
- the City was negligent in training Guerra in the proper procedure for responding to an incident like the one at issue in this case;
- officers should have been trained in approaching a person known to have a mental illness and in recognizing the need for an officer with crisis intervention team ("CIT") training at the scene;
- CIT training was completely ineffective, a problem known to the Charlotte-Mecklenburg Police Department ("CMPD") as a result of other incidents involving mentally ill persons;
- the officers should have been trained that a Spanish translator was necessary and not to

18

> give commands to a known Spanish speaker in English;

- Guerra, Suggs, and other officers were improperly trained in the use of deadly force; and

- this negligent training proximately caused the death of Galindo.

(Complaint, 1-2, ¶¶ 66-71).

North Carolina recognizes claims of negligent training based on the general elements of negligence. *Swick v. Wilde*, No. 1:10-cv-303, 2012 WL 3780350, at *30 (M.D.N.C. Aug. 31, 2012) (citing *Floyd v. McGill*, 575 S.E.2d 789, 793–94 (N.C. Ct. App. 2003) (evidence sufficient to permit jury to determine whether transit authority met its duty of care while training bus driver)). To make out a claim for negligence, a plaintiff must establish: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) and the breach was an actual and proximate cause of the plaintiff's injury. *Shook v. Lynch & Howard, P.A.*, 563 S.E.2d 196, 197 (N.C. Ct. App. 2002). Generally, whether a plaintiff has established the requisite elements of negligence is a matter for the jury. *Gibson v. Ussery*, 675 S.E.2d 666, 668 (N.C. Ct. App. 2009). Summary judgment, therefore, is appropriate only if there are no genuine issues of material fact and there is no evidence supporting one of the elements of negligence. *Shook*, 563 S.E.2d at 197.

In responding to the City's Motion for Summary Judgment on the claim of negligent training, Plaintiff faults the City for arguing the wrong legal standard and points to Guerra's alleged violation of CMPD Standard Operating Procedures ("SOPs") regarding the use of interpreter services, CIT techniques, and deadly force. (38, Response at 8–10). However, she does not point to any evidence showing the City's training was itself deficient. Indeed, Plaintiff's expert witnesses each opined that Guerra, Suggs, and other officers violated standards for dealing with mentally ill and Spanish-speaking persons and for using deadly force, (Tucker Report, 33-9, p. 4–6 (considering law enforcement standards generally); Harmening Report, 33-15, p. 14–19

19

(considering CMPD SOPs); Harmening Depo., 40-1, p. 96–98), but neither criticized the City's training of the officers.

Furthermore, there is no showing that any alleged negligent training proximately caused the death of Galindo. Galindo had ignored or rejected the advice of the Spanish speaking dispatcher and the Spanish command of Officer Guerra. There is no evidence that a Spanish translator would have been any more successful. Additionally, Plaintiff has failed to present any expert testimony on the applicable standard of care, without which a jury would have no basis for assessing duty and breach of duty.

The Court, therefore, finds there is insufficient evidence of negligence on the part of the City to establish a genuine issue for trial. *See Swick,* 2012 WL 3780350, at *30–31 (naked assertion about police academy training failed to create genuine issue of material fact on claim that town negligently trained officers).

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motions for Summary Judgment, (Doc. Nos. 27, 29), are **GRANTED**; and
2. Plaintiff's Motion for Partial Summary Judgment, (Doc. No. 30), is **DENIED**.

The Clerk is directed to close this case.

Signed: September 30, 2021

Robert J. Conrad, Jr.
United States District Judge

20

Case 3:19-cv-00491-RJC-DCK   Document 50   Filed 09/30/21   Page 20 of 20