**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2223**

———————

AZUCENA ZAMORANO ALEMAN, individually and as Administrator of the
Estate of RUBEN GALINDO CHAVEZ,

       Plaintiff – Appellant,

   v.

CITY OF CHARLOTTE; DAVID GUERRA, individually and officially,

       Defendants – Appellees,

   and

COURTNEY SUGGS, individually and officially,

   Defendant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at
Charlotte.  Robert J. Conrad Jr., District Judge.  (3:19-cv-00491-RJC-DCK)

———————

Argued:  December 7, 2022                         Decided:  August 16, 2023

———————

Before KING and RICHARDSON, Circuit Judges, and KEENAN, Senior Circuit Judge.

———————

Affirmed in part, vacated in part, and remanded by published opinion.  Judge King wrote
the majority opinion, in which Senior Judge Keenan joined.  Judge Richardson wrote a
dissenting opinion.

———————

**ARGUED:** S. Luke Largess, TIN FULTON WALKER & OWEN, Charlotte, North Carolina, for Appellant. Lori R. Keeton, LAW OFFICERS OF LORI KEETON, Charlotte, North Carolina; Roger A. McCalman, OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Brian R. Hochman, Bradley W. Butler, BUTLER, QUINN & HOCHMAN, PLLC, Charlotte, North Carolina, for Appellant. Clarence E. Matherson, Jr., OFFICE OF THE CITY ATTORNEY, Charlotte, North Carolina, for Appellee City of Charlotte.

————————————

KING, Circuit Judge:

This civil action on appeal from the Western District of North Carolina arises from the September 2017 fatal police shooting of Ruben Galindo Chavez (who used the surname "Galindo") during an encounter with officers of the Charlotte-Mecklenburg Police Department. The action was initiated by plaintiff Azucena Zamorano Aleman — Galindo's girlfriend and the mother of his child — both as the administrator of Galindo's estate and in her individual capacity. The plaintiff's five causes of action include a 42 U.S.C. § 1983 claim against defendant David Guerra, the police officer who fired the lethal shots, for use of excessive force in violation of Galindo's Fourth Amendment rights, plus the following state law claims: a claim against Guerra for assault and battery; claims against both Guerra and the City of Charlotte for wrongful death caused by negligence and for negligent infliction of emotional distress; and a claim against the City alone for negligent police officer training.

After amassing an assortment of evidence during discovery, including video footage from body cameras worn by the officers present at the shooting scene, the parties filed cross-motions for summary judgment. For reasons outlined in its Order of September 2021, the district court awarded summary judgment to the defendants on each of the plaintiff's claims. *See Aleman v. City of Charlotte*, No. 3:19-cv-00491 (W.D.N.C. Sept. 30, 2021), ECF No. 50 (the "Opinion"). The court therein determined that — because it was objectively reasonable for Officer Guerra to shoot Galindo, in that Galindo posed an immediate threat to Guerra and others — Guerra is entitled to qualified immunity on the Fourth Amendment claim. For the same reason, the court awarded summary judgment to

3

Guerra and the City on the assault and battery, wrongful death, and negligent infliction of emotional distress claims. Citing a lack of sufficient evidence, the court also awarded summary judgment to the City on the negligent training claim.

The appeal now being pursued by the plaintiff presents several close questions on the facts and applicable law, against a backdrop of tragic and dangerous circumstances. As we recently acknowledged in another fatal police shooting case, "[i]t is not lost on us that we issue this decision from the calm of a courthouse" and that, "[u]nlike us, [the defendant officer] could not press pause or rewind before determining whether [the decedent] posed an imminent threat." *See Franklin v. City of Charlotte*, 64 F.4th 519, 539 (4th Cir. 2023). Upon careful consideration of the video footage and the other evidence in the record, we are satisfied to affirm the district court's summary judgment award to the City on the negligent training claim. On the other hand, we vacate the award of qualified immunity to Officer Guerra on the Fourth Amendment claim, as well as the related summary judgment awards to Guerra and the City on the balance of the state law claims. Rather than directing the entry of judgment in favor of the plaintiff on any of those claims, we remand for further proceedings as to all of them.

I.

A.

The plaintiff initiated this action in August 2019 in a state court in Mecklenburg County, North Carolina, and the defendants removed the matter in September 2019 to the Western District of North Carolina. Of the plaintiff's five causes of action, four were

asserted on behalf of Galindo's estate: the Fourth Amendment and assault and battery claims against Officer Guerra; the wrongful death claim against Guerra and the City of Charlotte; and the negligent training claim against the City. The plaintiff alleged the remaining cause of action — the negligent infliction of emotional distress claim against Guerra and the City — on her own behalf.

The parties engaged in extensive discovery proceedings, securing not only the video footage from the body cameras worn by Officer Guerra and the other police officers present at the shooting scene, but also copies of relevant 911 dispatch records, depositions of Guerra and his colleagues, and records of the officers' interviews during the Charlotte-Mecklenburg Police Department's internal investigation of the shooting. In addition, the parties presented expert witnesses on the reasonableness of Guerra's actions and the adequacy of the City's police officer training.

By their respective summary judgment motions, Officer Guerra and the City requested judgment as to all the plaintiff's claims. The plaintiff's cross-motion for summary judgment sought only a partial judgment, on the Fourth Amendment, assault and battery, and negligent infliction of emotional distress claims.

### 1.

As the plaintiff has highlighted in the summary judgment proceedings, the record reflects that at the time of the September 2017 shooting, Galindo was a 30-year-old

Mexican man who worked in the Charlotte area and did not speak English.[1]  He had recently been diagnosed with paranoia, without being deemed a danger to himself or others. Galindo was facing North Carolina charges of misdemeanor assault by pointing a firearm and simple assault, but he had no other known history of criminal activity.

a.

(1)

On September 6, 2017, at about 9:04 p.m., Galindo placed the first of two 911 calls seeking assistance from the Charlotte-Mecklenburg Police Department.  To accommodate Galindo, that call was transferred to a Spanish-speaking dispatcher available through the Department's Spanish language phone line.  During the call, which lasted approximately 18 minutes, Galindo said that he sought to turn himself in for impending court proceedings and that he wanted police officers to pick him up at his apartment, located at 1918 Prospect Drive, in Charlotte.  Galindo also gave the following reason for requesting the officers: "Because I have a gun in my hand."  *See* J.A. 243.[2]

---

[1] Of course, pursuant to the applicable summary judgment standard, we must view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).  That means we must view the facts in the plaintiff's favor when considering the summary judgment motions of Officer Guerra and the City, and in those defendants' favor when considering the plaintiff's cross-motion for partial summary judgment.

[2] The English language transcripts of the two 911 calls quoted herein are unverified translations that the defendants provided in discovery and that the plaintiff has invoked in the summary judgment proceedings.  *See* J.A. 243-48.  (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

When asked by the dispatcher what he was "going to do with the gun," Galindo responded with the query, "Are you going to help me or are you not going to help me?" *See* J.A. 243. Pressed about his intentions, Galindo said that the dispatcher should "tell me if [the officers] are coming or not so that I can put my firearm there in the front or whatever," suggesting that he intended to surrender the firearm. *Id.* at 244.

Meanwhile, Galindo repeatedly failed to provide information expressly requested by the dispatcher, including whether he was suicidal or homicidal. Some of Galindo's remarks to the dispatcher evidenced his paranoia. For example, Galindo first claimed his name was "El Dios Estrella" (which translates to "the Star God"), before giving the name "Ruben Galindo." *See* J.A. 244-45. He complained of police officers and other people "following me," and he said that "I can't take it any longer." *Id.* at 245. Galindo also admitting to drinking alcohol that day but denied using drugs.

Throughout the first 911 call, Galindo asked whether he was going to receive any help, prompting the dispatcher to periodically assure him that police officers were on the way. At one point, having heard a woman's voice in the background, the dispatcher asked Galindo how many people were in his apartment. Galindo did not provide that information. Rather, he answered: "Look, I only need [the officers] to come for me[.] It's only for me [and] I will be outside of the apartment." *See* J.A. 245. Galindo elaborated, "I only need the police to come for me, for them to take me." *Id.* He also requested that a responding officer be "someone that speaks Spanish." *Id.*

Near the end of the first 911 call, the dispatcher elicited from Galindo that he was still inside the apartment but would go outside once the police officers were there. When

7

specifically asked if he was "thinking of harming the officers" or "anyone in [his] house," Galindo responded, "No." *See* J.A. 246. He again expressed that "I want to turn myself in" and that "I prefer for [the officers] to lock me up." *Id.* The dispatcher's last statement to Galindo during the call was that "the officers are in route, they are on their way and they will be there as soon as possible, thank you." *Id.* Galindo responded before the call was disconnected, "Are they coming or not because [I] can't take it anymore." *Id.*

(2)

A few minutes later, Galindo placed his second 911 call, which lasted for nearly 12 minutes and remained connected until after the fatal shooting. During that call, Galindo and the Spanish-speaking dispatcher mainly discussed Galindo's firearm. At the outset, Galindo said that the firearm was "[i]n my bag" and that "if you want I will take it out." *See* J.A. 247. The dispatcher then repeatedly instructed Galindo to leave the firearm in a safe place and not to have it when the police officers arrived to meet him outside his apartment. Specifically, the dispatcher advised: "leave it in a safe place and when you see the officers, show your hands, I don't want you to have the [firearm]"; "[n]o please, no, no please [do not have the firearm with you]"; "please leave it" "for your safety and of everyone's"; "I need you to assure me that you will leave the gun please"; and "I need you to please put that gun somewhere please." *Id.* at 247-48.

Even as the dispatcher gave those instructions, Galindo continually indicated that he planned to have his firearm with him when he met the police officers. He also suggested, as he had during the first 911 call, that he intended to surrender the firearm. That is, Galindo asked the dispatcher, "How do you want me to show a firearm?" *See* J.A. 248.

8

Soon thereafter, he stated that "as long as [the officers] don't shoot me I will throw them

the gun." *Id.* While reportedly "giggling" during the second 911 call, Galindo asserted

that the firearm "doesn't have bullets." *Id.* at 247. He then said approximately 11 more

times that "I don't have bullets." *Id.* at 247-48. Galindo's last words to the dispatcher

before the shooting were, "Look I know that you are nervous, and all of that, I know, well

me too," followed by, "Can you help me or not?" *Id.* at 248.

b.

At about 9:10 p.m., approximately six minutes into Galindo's first 911 call, a request

had gone out for officers of the Charlotte-Mecklenburg Police Department to respond to a

Spanish-speaking caller who "adv[ised] he's armed with a gun and wants officers to come

help him." *See* J.A. 108. That request was promptly entered into the Department's

computer system as an "event." The computer system identifies and records the officers

who respond to such an event and allows the dispatcher to provide updates as relevant

information becomes available. The responding officers receive the updated event

information in real time on laptops in their patrol vehicles.

Information about the "Galindo event" was updated throughout his first 911 call,

with the dispatcher relaying the following to the responding officers:

- "Refuses to give . . . further information";

- "Unk[nown] what he wants to do with the gun";

- "Unk[nown] if the comp[lainant] is homicidal or suicidal";

- "Adv[ises] he wants to turn himself in, unk[nown] reason, unk[nown] warrant";

- "Comp[lainant] is not cooperating";

9

- "See El Dios Estrella (Rub[e]n Galindo)";[3]

- "Comp[lainant] has been drinking, neg [denies] drugs";

- "Unk[nown] how many times the res[idence] is occupied.  Heard a female in the b[ackground]"; and

- "***Use Caution.  Comp[lainant] sounds delusional.***"

*See* J.A. 108-09.

The Galindo event information was not updated during his second 911 call.  In radio communications, however, the responding officers were informed that Galindo had told the dispatcher that his "gun has no bullets." *See* J.A. 241.  The officers were also advised that Galindo had "said that he would put down the gun when [the officers] arrived." *Id.* at 313.

c.

Officer Guerra and three of his colleagues — Officers Ryan Tran-Thompson, Courtney Suggs, and David Batson — responded to the Galindo event.  As explained in their depositions in this civil action, none of the four responding officers was fluent in Spanish.  The officers initially met in a parking lot near their police station to review the information they had about Galindo, to discuss concerns that he could be intending an ambush, and to make a plan for safely approaching him.  During the meeting, Officer Batson searched law enforcement databases for Galindo's name and found that a "Ruben Galindo" had been charged in April 2017 with assault by pointing a firearm.  Additionally,

---

[3] The Galindo event information thus reported the two names that he gave the dispatcher — "El Dios Estrella" and "Ruben Galindo" — without explaining that "El Dios Estrella" translates to "the Star God." *See* J.A. 113.

10

Officer Tran-Thompson asked his colleagues how to say "hands up" in Spanish and got the reply "manos arriba." *See* J.A. 628.

Consistent with the request made by Galindo during his first 911 call, a Spanish-speaking officer was summoned from a neighboring division to assist the responding officers. At about 9:21 p.m., the Spanish-speaking officer announced that he was en route. By then, however, the responding officers had received the event update that included "[h]eard a female in the b[ackground]." *See* J.A. 109. That update, which came at about 9:18 p.m., alerted the responding officers that there was a woman or girl in the apartment with Galindo and caused them to fear that the situation could escalate to domestic violence. Consequently, the responding officers decided to proceed to Galindo's apartment without waiting for the Spanish-speaking officer.

Based on his police experience with Spanish speakers, Officer Guerra expected Galindo to understand simple English phrases such as "are you okay" and "what can I do for you." *See* J.A. 303. Guerra also thought he could speak enough Spanish to convey the message, "Hey, I don't speak Spanish, but someone who speaks Spanish is coming soon." *Id.* As for the dispatcher's warning that Galindo "sounds delusional," *see id.* at 109, Guerra "wasn't sure if it was a clinical diagnosis that [Galindo] was delusional or if it was figurative or what." *Id.* at 295. Guerra thought "to assess the situation accurately," he "would have to do it best in person" and "try to establish an open line of communication [with Galindo] and basically feel him out." *Id.* at 296.

11

d.

Between 9:28 and 9:29 p.m., after dark, the four responding officers arrived at the large apartment complex where Galindo resided and parked several buildings away from Galindo's Building 1918.  His residence was in an apartment located at an end of the building and abutted by a small, wooded area.  The patio entrance to Galindo's apartment faced a wall of Building 1920 containing the patio entrances to the apartments located therein.  A bright streetlight illuminated the walkway right outside of Galindo's apartment, affording a clear view of where Galindo would stand when he exited through his screen patio door.  No other person was present in the outside area between the apartment buildings.

The four responding officers approached Galindo's apartment at approximately 9:30 p.m.  Officer Guerra took a position alongside the closest corner of Building 1920, approximately 10 yards from Galindo's patio entrance.  Meanwhile, Officer Tran-Thompson took a position several yards farther away, in the wooded area behind and to the left of Guerra.  Both Tran-Thompson and Guerra were armed with rifles.  For their part, Officers Batson and Suggs carried handguns and took positions on the opposite corner of Building 1920, approximately 20 yards from Galindo's patio entrance.  Each of the responding officers had a position that provided cover.

Each officer also wore a body camera, with the video footage from Officer Tran-Thompson's camera being the footage that most fully shows the scene as it unfolded. Because of the stance of his body during the encounter, Officer Guerra's camera was largely blocked by the corner of Building 1920, with just a partial view of Galindo.

12

Moreover, the footage from Officer Batson's and Officer Suggs's cameras shows Galindo's left arm only. But Tran-Thompson's camera was unobstructed and filmed both Guerra and Galindo throughout the encounter, including the moments when the fatal shots were fired.

e.

As the plaintiff has described it, the video footage from the responding officers' body cameras reveals that, upon taking his position alongside the corner of Building 1920, Officer Guerra called out "Ruben" to a man standing behind the screen patio door of Galindo's apartment. That man — Ruben Galindo — responded in the affirmative and opened the door, prompting Guerra to call out, in Spanish, "Ruben, policia, manos, manos" (which translates to "Ruben, police, hands, hands"). Guerra moved out from his cover to engage with Galindo, such that Galindo could view Guerra's entire body.

Immediately after opening the screen patio door, Galindo stood in the doorway, facing Officer Guerra. Galindo's left arm was down at his side, and his right arm was similarly at his side but just behind the door frame. Guerra pointed his rifle at Galindo's lower body and quickly said "manos" two more times. Concomitantly, Guerra raised his right arm off the barrel of his rifle, demonstrating to Galindo to raise his hand.

In response to Officer Guerra's Spanish commands of "manos," Galindo raised his left hand — in which he was holding a pistol — to about waist level. According to the plaintiff, it is unclear from the video footage whether the pistol had already been in Galindo's left hand or whether Galindo grasped the pistol just before raising the hand, but the video footage suggests that the pistol had already been in Galindo's left hand. After

13

raising the hand to about waist level, Galindo paused, which the plaintiff asserts was a demonstration of Galindo's uncertainty as to whether he should throw the pistol or continue holding it in his raised hand.

The sight of the pistol caused Officer Guerra to yell, now in English, "put it down, drop the gun, put it down." Galindo reacted to those English commands by quickly raising his left arm above his shoulder and extending his left hand — still holding the pistol — past the end of the opened screen patio door. Galindo's left arm was then extended about 45 degrees from the center of his body and pointing toward the wall of Building 1920, leaving it about 45 degrees away from Guerra.

When Galindo raised his left arm, he also began to raise his right arm. From there, the four responding officers shouted over each other, still in English, to "drop the gun" and "put it down." As they shouted, Galindo swiftly raised his right arm and extended it out like his left, above shoulder height and about 45 degrees from the center of his body.

The plaintiff does not contend that any of the video footage from the responding officers' body cameras is clear enough to conclusively show how Galindo was holding the pistol in his left hand or where the pistol itself was pointing as he raised his left and then right arms. But the plaintiff maintains that the video footage firmly establishes that Galindo was ultimately standing still with both his arms frozen in place and both his hands in the air, in a universally recognized position of surrender. And Galindo's left arm remained pointing at the wall of Building 1920, not at Officer Guerra.

It was at that point that Officer Guerra fired at Galindo twice. Under the plaintiffs' interpretation of the video footage, the first shot caused Galindo to collapse and fall

14

forward, and the second shot hit him in the top of the head as he fell. Approximately four seconds had elapsed between Guerra's first English commands to "put it down, drop the gun, put it down" and his first shot at Galindo, who died at the scene.[4]

f.

Two days later, on September 8, 2017, investigators with the Charlotte-Mecklenburg Police Department interviewed Officer Guerra about the fatal shooting. Notably, Guerra had not yet viewed the video footage from his and the other responding officers' body cameras.

In his interview with the shooting investigators, Officer Guerra asserted that when Galindo opened his screen patio door, Guerra called out "manos arriba" ("put your hands up"). *See* J.A. 446. Guerra described Galindo as facing Guerra, with the door open behind Galindo. Additionally, Guerra demonstrated that Galindo fully raised both his arms in response to Guerra's "manos arriba" command. Guerra then said that — after Galindo fully raised both his arms — Galindo kept his right arm raised but lowered his left arm, reached into his pocket, and pulled out his pistol. According to Guerra, Galindo had the pistol "gripped high in the palm of the hand" and "his fingers were wrapped around the

---

[4] Plaintiff Azucena Zamorano Aleman was inside the apartment at the time of the fatal shooting and was heard screaming in the background of Galindo's still-connected second 911 call, which had been made on a cell phone that Galindo was carrying during the encounter with Officer Guerra and his colleagues. The plaintiff has described the video footage from the officers' body cameras as showing her rushing outside, shouting "Ruben," and becoming hysterical when she saw Galindo's body on the ground. The plaintiff asserts that she has since been diagnosed with severe chronic depression and post-traumatic stress disorder related to the shooting.

pistol grip" such that he was "about to fire." *Id.* at 447. Guerra also recounted that, upon

his subsequent instructions to "drop the gun," Galindo "pivot[ed] the firearm towards me"

with "the muzzle raised in my direction." *Id.* at 448-49. In Guerra's words, "I had the

conscious thought of I have to shoot this guy because I immediately felt a threat [of] death

[or] serious bodily injury from him pointing a firearm at me." *Id.* at 449. Guerra explained

that he fired the second shot at Galindo because Galindo remained standing after the first

shot, making it unclear whether the first shot had hit him.

At Officer Guerra's subsequent deposition in this civil action, after viewing the

video footage from the responding officers' body cameras, Guerra conceded that he had

called out only "manos" to Galindo, not "manos arriba." *See* J.A. 315. Guerra confirmed

that Galindo had been facing Guerra during the encounter. He also reiterated, based on his

"memory" rather than the video footage, that Galindo initially raised both his arms and

then kept his right arm raised while lowering his left arm and retrieving his pistol from his

pocket. *Id.* at 318.

Upon rewatching the video footage during his deposition, Officer Guerra admitted

that, when he shot Galindo, both of Galindo's arms were raised and extended about 45

degrees from the center of his body, with his left arm pointed at the wall of Building 1920,

away from Guerra. Further, Guerra acknowledged that he would consider that to be a

position of surrender "[f]or an unarmed subject." *See* J.A. 326.

In any event, Officer Guerra stood by his previous account that Galindo had pivoted

his pistol toward Guerra, justifying Guerra's shooting of Galindo. Guerra sought to clarify

that Galindo had pivoted his left elbow and thereby pointed his pistol at Guerra. Further,

16

Guerra asserted that, although Galindo's left arm continued to point at the wall of Building 1920, "it is possible to hold your arm up and still point [a pistol] in a separate direction." *See* J.A. 332. Guerra did not claim that any pivot of Galindo's left elbow, or the direction in which the pistol was pointed, can be seen in the video footage.

Regarding his prior statement that he fired the second shot at Galindo because Galindo remained standing after the first, Officer Guerra conceded that the second shot hit Galindo in the top of the head. But Guerra allowed only that it was "possible" that Galindo must have been falling from the first shot in order for the second shot to have hit where it did. *See* J.A. 340.

Finally, as for the issue of how Galindo had been holding his pistol, Officer Guerra continued to insist that Galindo held the pistol "high and firm with a pistol grip," which is "how you hold [a pistol] before you fire it." *See* J.A. 317. Prior to Guerra's deposition, however, Officer Batson had related in his interview with the shooting investigators that he saw Galindo holding the pistol upside down, with the grip pinched between his thumb and fingers — not in the shooter's position described by Guerra. Batson later, in his deposition testimony, reiterated that description of how Galindo had been holding his pistol. Confronted with Batson's account during his own deposition, Guerra acknowledged that the manner in which Batson saw Galindo holding the pistol was "pretty much the opposite" from the way in which Guerra saw it. *Id.* at 333. Guerra then suggested that he was in a better position than Batson to discern how the pistol was actually being held, as his "vantage point" had "better lighting" and was "much closer" than Batson's. *Id.* at 335.

17

Indeed, Guerra confirmed that he "could see the gun and the details of the gun" throughout the encounter with Galindo. *Id.* at 338.

2.

For their parts, Officer Guerra and the City of Charlotte have highlighted much of the same foregoing evidence in the summary judgment proceedings, with an emphasis on inferences that can be drawn in their favor. The defendants have also raised some additional aspects of the record. Those include Officer Batson's deposition testimony that Galindo could have fired his pistol while holding it upside down by either using his pinky finger or changing his grip, along with deposition testimony of Batson, as well as Officer Suggs, that Galindo's pistol had been pointed toward Guerra.

In other deposition testimony invoked by the defendants, Officer Tran-Thompson recounted hearing Officer Guerra shout out "manos arriba" to Galindo and seeing a metallic object in Galindo's left hand. Tran-Thompson stated that, as he then joined Guerra in yelling "drop the gun" and "drop it," Galindo raised both his hands upward, turned his body toward Guerra, took a small step in Guerra's direction, and began to lower his left arm or elbow. According to Tran-Thompson, it appeared to him that "Galindo was getting ready to punch out and take a shooter's stance by punching his arm straight forward out towards Officer Guerra and possibly begin shooting at Officer Guerra." *See* J.A. 619. That is, Tran-Thompson said he "observed movements [indicating that Galindo] was going to take a shooter's stance and start firing at Guerra." *Id.* at 624. Once the deposition proceeded to a viewing of the video footage from the responding officers' body cameras,

18

however, Tran-Thompson acknowledged that the footage does not show any of the threatening movements that he had described.

### 3.

Turning to the expert witnesses, the parties collectively presented three experts on the use of force and police officer training:  Jon Blum for the defendants, and William Harmening and Melvin Tucker for the plaintiff.  Upon reviewing the evidence in the summary judgment record, those witnesses opined — by written reports and, in the case of the plaintiff's experts, by deposition testimony — on both the reasonableness of Officer Guerra's actions and the adequacy of the training provided by the City of Charlotte.[5]

### a.

Regarding the issue of whether Officer Guerra's actions were reasonable, each expert witness considered the totality of the circumstances facing Guerra when he fired the fatal shots at Galindo.  Those circumstances included that Galindo:  had called 911 for unclear reasons and admitted to drinking and being armed with a "gun"; was described by the Spanish-speaking dispatcher as being uncooperative and seemingly "delusional"; was suspected of having committed a previous firearm-related offense; presently posed a threat

---

[5] We note that, in summary judgment proceedings, a court may consider an expert report that would itself be inadmissible at trial where "the party submitting the evidence shows that it will be possible to put the information into an admissible form."  *See Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (alterations and internal quotation marks omitted).  That showing must be made where there has been an objection to the court's consideration of the expert report on grounds of inadmissibility.  *Id.* at 538-39 (citing Fed. R. Civ. P. 56(c)(2)).  Here, however, no such objection was lodged.

of domestic violence to a "female" inside his apartment and of ambush to the responding police officers; brandished his pistol when he met the other officers outside the apartment, in contravention of the dispatcher's repeated Spanish instructions to leave the firearm behind; and failed to drop the pistol in response to Guerra's and the other officers' English commands to "drop the gun" and "put it down." *See* J.A. 108-09.

As part of the analysis in his report, the defendants' expert (Blum) also accepted as true — based on Officer Guerra's post-shooting statements, and not on the video footage from the body cameras worn by Guerra and the other responding officers — that Galindo had "pivoted his left elbow backwards" after raising his left arm and hand holding his pistol. *See* J.A. 203. According to Blum, that movement "led officers on the scene and in the moment to believe that [Galindo] was going to point the handgun at and shoot Officer Guerra." *Id.* at 206. Consequently, Blum concluded that Guerra's use of deadly force against Galindo was justified in the totality of the circumstances. In Blum's words, "it was reasonably necessary for Guerra . . . to use deadly force and defend [himself] because Mr. Galindo posed an imminent threat of death or great bodily harm." *Id.* at 211 (emphasis omitted).

Of the plaintiff's experts, the first (Harmening) readily acknowledged in his deposition testimony that the circumstances created a "volatile and dangerous situation" — "especially with a gun involved." *See* J.A. 731. Harmening also recognized that, even if Galindo had been holding his pistol upside down as Officer Batson described, the pistol could have been fired. *Id.* at 734 (explaining that "a gun can always be fired no matter how they're holding it"). Nonetheless, based on Batson's description of Galindo pinching the

20

pistol's grip between his thumb and fingers — as well as what Harmening could see on the video footage from the responding officers' body cameras — Harmening concluded that Galindo was not holding the pistol in "a firing stance" or in such a way "to indicate that he's going to use it." *Id.* at 733-34.

The video footage further led Harmening to reject Officer Guerra's account that Galindo had pivoted his left elbow and thereby pointed the pistol toward Guerra. As Harmening interpreted the video footage and Galindo's demeanor therein, Galindo "never pointed a gun at [Guerra] and never demonstrated anything to indicate that he was going to point a gun at [Guerra]." *See* J.A. 733. Harmening elaborated:

> [M]y perception of the video and what I see is a man who's trying to comply with everything he's being told. I get it, [Galindo] didn't leave the gun inside, he didn't drop the gun yet, but I think there's also a communication barrier and some confusion here, but I think for the most part he was trying to comply.

*Id.* at 734. Similarly, Harmening interpreted Galindo's 911 calls and discussion with the dispatcher to indicate that he did not intend to harm any of the responding officers. Harmening specifically mentioned Galindo's assurances that his pistol had no bullets, explaining that although Guerra could not assume the pistol was unloaded, "it's part of the totality of the consideration here that [Galindo] says it's not loaded." *Id.* at 733. Additionally, Harmening suggested that Guerra should have considered that he and the other officers had "good cover" available. *Id.*

All told, Harmening opined "that a gun is always a threat," but that "there has to be an active threat before [police officers] shoot somebody." *See* J.A. 733, 735. In Harmening's view, there was no active threat justifying Officer Guerra's shooting of

Galindo, because Galindo was "complying with [Guerra and his colleagues]," albeit "not perfectly," and "because at the moment [Galindo] got shot, both [his] arms [were] in the air, [and] he [was] clearly showing [the officers] the gun that I believe [was] not pointed at anyone, nor [was] it even being held in a manner that could be fired accurately at anyone." *Id.* at 736.

Much like Harmening, the plaintiff's second expert (Tucker) opined that Officer Guerra "did not have any justification on September 6, 2017 to use deadly force against Ruben Galindo" because Galindo had not been "posing an immediate threat of serious body harm or death to anyone," i.e., "a threat that is going to occur at that moment in time absent intervention." *See* J.A. 650, 652. As Tucker explained in his report, he based that opinion on the video footage from the responding officers' body cameras, which Tucker interpreted to show that Galindo "never pointed [his pistol] at anyone before he was shot and killed" and that "the officers had cover available, nobody else was in danger[,] and [the] firearm in [Galindo's] left hand was up in the air." *Id.* Tucker "reaffirm[ed]" his opinion by his subsequent deposition testimony, saying that — in reviewing the contrary opinion of defendants' expert Blum that deadly force was reasonable and necessary in the totality of the circumstances — "I kept thinking necessity, necessity, where in the heck is necessity here?" *Id.* at 785-86.

b.

With further respect to the reasonableness of Officer Guerra's actions, as well as to the adequacy of the police officer training provided by the City of Charlotte, the plaintiff's experts Harmening and Tucker acknowledged that the City had relevant policies in place

22

concerning the use of force and interacting with non-English speakers and persons suffering from mental illness. Those experts also acknowledged that the City had trained Guerra and his colleagues on those policies. Rather than questioning the sufficiency of the policies or the attendant training, Harmening and Tucker criticized Guerra and the other responding officers for disregarding their training and violating the City's policies. Indeed, Tucker testified in his deposition that he "thought the officers were either plainly incompetent or intentionally violated the laws and protocols." *See* J.A. 785.

Specifically addressing the responding officers' decision not to await the arrival of a Spanish-speaking officer before confronting Galindo, Harmening opined in his report that the officers should have recognized from their training "that a Spanish-speaking officer was going to be critical," in that the Galindo event "should have been viewed as a crisis intervention, and as such, effective communication (i.e., de-escalation) was going to be needed, especially with the presence of a gun." *See* J.A. 693. Harmening further asserted that Officer Guerra should have yet followed his training by, inter alia, "ask[ing] [Galindo] in a calm voice if he spoke English"; "reassur[ing] him that [the officers] were there to help"; "ask[ing] him in a non-threatening voice to lay the gun down on the ground"; and, "[i]f he indicated in some manner that he did not speak English, . . . motion[ing] to him with hand gestures to lay the gun down." *Id.* at 695. Instead, Harmening underscored, Guerra simply said "manos" ("hands") in Spanish and then he and the other officers "commanded Galindo to drop the gun in English," thereby increasing "[t]he possibility of confusion." *Id.* at 693.

The defendants' expert Blum countered that the responding officers' conduct was consistent with both the City's policies and the training provided by the City to the officers. Blum focused on Officer Guerra's use of deadly force against Galindo, opining that Guerra followed his training and the applicable policies on the use of such force when he fatally shot Galindo after "Mr. Galindo refused to follow repeated officer instructions to 'Manos' and 'Drop the gun!'" and then "began to point [his pistol] at Officer Guerra (as perceived by officers in the moment and on the scene)." *See* J.A. 210-11.

4.

By his summary judgment motion, Officer Guerra sought qualified immunity on the Fourth Amendment claim, arguing that his fatal shooting of Galindo was objectively reasonable (such that he did not contravene Galindo's Fourth Amendment rights by using excessive force) and that there was no controlling legal precedent at the time of the shooting that indicated otherwise (such that any constitutional right violated was not, in any event, clearly established). *See, e.g.*, *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (explaining that, to defeat a claim of qualified immunity, a plaintiff must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct" (internal quotation marks omitted)). Based on the alleged objective reasonableness of the shooting, Guerra and the City of Charlotte also sought summary judgment on the assault and battery, wrongful death, and negligent infliction of emotional distress claims.

The defendants have insisted that the shooting was objectively reasonable in that Officer Guerra shot Galindo only after perceiving that Galindo was poised to fire his pistol

24

at Guerra or others — a perception that the defendants admit may have been mistaken, but that they contend was nonetheless reasonable.  In so arguing, the defendants have relied on supportive deposition testimony of Guerra and his colleagues, along with the report of the defendants' expert Blum.  To the extent that the video footage from the responding officers' body cameras conflicts with or fails to corroborate Guerra's account of the shooting, the defendants maintain that the video footage does not reflect what Guerra could reasonably perceive because it was largely taken from the body cameras of other officers whose positions were different from his.  The defendants also emphasize that the video footage is not clear in all details and did not capture everything that occurred at the shooting scene.

The plaintiff generally has not disputed that the video footage is neither entirely clear nor complete.  But in opposing the defendants' summary judgment motions, and in advancing her own request for partial summary judgment, the plaintiff has argued that the video footage is decisive in that it "quite clearly establish[es] that Galindo was not a threat to anyone at the moment Guerra killed him."  *See* Br. of Appellant 22 (internal quotation marks omitted) (echoing arguments made in district court).  As the plaintiff's experts Harmening and Tucker opined after studying the video footage, the plaintiff contends that the video footage shows that Guerra and the other responding officers had cover available; that Galindo was apparently confused by but attempted to comply with the officers' mix of Spanish and English commands; that Galindo quickly assumed a position of surrender; that Galindo did not seem to be pointing his pistol at Guerra; and that Galindo did not make any movement suggesting that he intended to fire his pistol, whether at Guerra or anyone else.

Additionally, the plaintiff has argued that the video footage "blatantly contradicts" Officer Guerra's account of the shooting. *See* Br. of Appellant 22; *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (recognizing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"). Specifically, under the plaintiff's interpretation of the video footage, it establishes the following:

- In response to Officer Guerra's initial Spanish commands of "manos," Galindo kept his right hand down while raising his left hand, in which he held his pistol (and apparently had already been holding the pistol), to about waist level;

- Next, after Guerra commanded in English to "put it down, drop the gun, put it down," Galindo continued to hold the pistol in his left hand while raising his left arm above his shoulder and extending it about 45 degrees from the center of his body, and then similarly raising and extending his right arm;

- Thereafter, Galindo was standing still with both his arms frozen in place, leaving his left arm pointing at the wall of Building 1920, not at Guerra; and

- Galindo remained in that position until he was hit by Guerra's first shot, which caused Galindo to collapse and fall forward, such that Guerra's second shot hit Galindo in the top of the head as he fell.

According to the plaintiff, the video footage thereby contradicts these aspects of Guerra's account of the shooting:

- Guerra's assertion that Galindo initially raised both his arms and then kept his right arm raised while lowering his left arm and retrieving his pistol from his pocket;

- Guerra's assertion that — although Galindo subsequently had both his arms raised and extended about 45 degrees from the center of his

26

body, with his left arm pointed at the wall of Building 1920, away from Guerra — Galindo then pivoted his left elbow and thereby pointed his pistol at Guerra;

- Officer Tran-Thompson's assertion that, just before being shot, Galindo took a small step in Guerra's direction and began to lower his left arm or elbow, making it appear that Galindo was preparing to "punch out," i.e., to take a shooter's stance and fire his pistol at Guerra; and

- Guerra's assertion that Galindo remained standing after the first shot, explaining why Guerra fired the second shot.[6]

The plaintiff has further highlighted the discrepancies between Guerra's assertion that Galindo had been holding his pistol "high and firm with a pistol grip" — as if he was about to fire it — and Officer Batson's statements that Galindo was holding the pistol upside down, with the grip pinched between his thumb and fingers.

Even if the video footage is not so unambiguous as to merit an award of partial summary judgment against Officer Guerra and the City, the plaintiff argues that she is at least entitled to a trial on the Fourth Amendment, assault and battery, wrongful death, and negligent infliction of emotional distress claims. In that regard, the plaintiff contends that a jury could rely on the video footage and other evidence not only to find that Galindo posed no immediate threat to Guerra or anyone else at the time of the shooting, but also to

---

[6] The plaintiff has also pointed out that the video footage contradicts the assertions of both Guerra and Tran-Thompson that Guerra's Spanish command to Galindo was "manos arriba" ("put your hands up"), rather than simply "manos" ("hands"). After viewing the video footage, Guerra conceded during his deposition that he said only "manos."

find that Guerra knew that the shooting was unjustified and that he concocted "a remarkably false story" to evade liability. *See* Br. of Appellant 23.

As for the negligent training claim against the City, the City sought summary judgment as to that claim on the ground, inter alia, of inadequate evidentiary support, as the plaintiff's own experts Harmening and Tucker criticized not the City's training of its police officers, but the failure of Officer Guerra and his colleagues to act in accordance with that training. That is, the plaintiff's experts acknowledged that the City had trained the officers on relevant policies concerning the use of force and interacting with non-English speakers and persons suffering from mental illness, and those experts identified no deficiencies in either the policies or the attendant training. In her summary judgment briefing, however, the plaintiff has suggested that negligent training can be inferred from the conduct of Guerra and his colleagues, particularly their decision to approach Galindo without the assistance of a Spanish-speaking officer.

## B.

Based on the analysis in its Opinion of September 2021, the district court granted the defendants' summary judgment motions and denied the plaintiff's cross-motion for partial summary judgment. The Opinion began with the Fourth Amendment claim against Officer Guerra, recognizing that Guerra would be entitled to qualified immunity if he did not "use[] unreasonable and excessive force in violation of Rub[e]n Galindo's Fourth Amendment rights." *See* Opinion 8. The court thus assessed the Fourth Amendment claim on the first prong of the qualified immunity analysis (whether Guerra had "violated a statutory or constitutional right"), and not on the second prong (whether "the right was

28

clearly established at the time of the challenged conduct"). *Id.* (quoting *Mays*, 992 F.3d at 301).

From there, the district court explained that "[w]hether excessive force was used is an objective inquiry assessing what a 'reasonable officer on the scene' would have done, taking into account [factors that include] whether the suspect posed an immediate threat to the safety of the officers or others." *See* Opinion 8 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Opinion elaborated that, "if at the moment Galindo was shot, he posed an immediate threat to officers and others, then Officer Guerra's actions were objectively reasonable. Conversely, if Galindo did not pose an immediate threat, [the plaintiff] would be entitled to partial summary judgment or at least the right to a jury trial." *Id.* at 9.

In the course of analyzing the Fourth Amendment claim, the district court rendered its own interpretation of the video footage from the body cameras worn by Officer Guerra and his colleagues. As the court saw it, the video footage shows the following:

> Guerra can be heard yelling out "manos, manos" (hands, hands) as Galindo came out [his screen patio] door with his right arm initially hidden from view behind the door frame and his left hand empty. Galindo then reached his left hand down to his left pocket and pulled out a gun . . . . As officers yelled "put it down" and "drop the gun, drop the gun," Galindo raised the gun half-way up to shoulder height and lowered it again. As officers continued to yell "put it down" and "drop the gun," Galindo raised his left arm then his right arm above shoulder height. At this point it can be seen from the [vantage points of Officers Batson and Suggs] that Galindo is holding the firearm upside down, but from the [video footage from Officer Tran-Thompson's body camera], the same cannot be said. Galindo's left hand began to drop just before shots were fired.

*See* Opinion 5.  The court thereby interpreted the video footage in ways different from both the plaintiff and the defendants.  For example, no party has asserted that the video footage establishes that Galindo's left hand was initially empty or that he reached into his pocket and then pulled out his pistol.  Nor has any party contended that the video footage shows that Galindo's left hand began to drop just before he was fatally shot by Officer Guerra.

Additionally, the district court rejected the plaintiff's contention that the video footage "blatantly contradict[s]" Officer Guerra's account of the shooting and criticized the plaintiff for "sometimes hyperbolic characterizations of what is contained in the video footage."  *See* Opinion 5 n.2.  The Opinion also emphasized that the video footage "include[s] angles of observation unavailable to Officer Guerra" — particularly the Batson and Suggs video footage — and that "Guerra's view was split-second and of course not subject to slow-motion or replay."  *Id.*  Indeed, the court went so far as to declare that the Batson and Suggs video footage is from "a view that cannot be the view of a reasonable officer in Guerra's position."  *Id.* at 10.

In any event, the district court's ruling on the Fourth Amendment claim was ultimately premised on what it deemed to be "the core uncontested and most probative fact of this case":  "that Galindo ignored the [Spanish-speaking dispatcher's] directive to leave the gun in the house and in response to the officer's command 'manos,' . . . drew [the] gun."  *See* Opinion 12.  As the Opinion characterized it, Galindo's conduct "could hardly be more provocative," even if it "was done in an ill-conceived attempt at surrender."  *Id.*  That is, once Galindo brandished his pistol, "[a] reasonable officer in Guerra's position did not have to wait; did not have to trust a man believed to be delusional, and possibly

30

homicidal or suicidal; a man who had refused every law enforcement directive aimed at keeping him and others safe." *Id.* at 11. Accordingly, the court concluded that Galindo posed an "imminent threat to officers and others" by being "a non-compliant, armed subject," such that it was objectively reasonable for Guerra to shoot him. *Id.* at 13.

The district court relied for its conclusion that Officer Guerra acted reasonably on this Court's decisions in *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998), and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). Those decisions, the Opinion observed, stand for the legal principle "that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *See* Opinion 11 (quoting *Anderson*, 247 F.3d at 131).

Turning to the state law claims against Officer Guerra and the City of Charlotte for assault and battery, wrongful death, and negligent infliction of emotional distress, the district court incorporated the Opinion's analysis concerning the reasonableness of Guerra's actions, as conducted for purposes of the Fourth Amendment claim. *See* Opinion 18. The court then concluded that — because "Guerra's conduct was justified and reasonable" — each of the state law claims fails as a matter of law. *Id.*

Finally, in assessing the state law claim against the City for negligent training, the district court ruled that the plaintiff had failed to produce evidence sufficient to establish any alleged training failure. *See* Opinion 18-20. The Opinion observed, inter alia, that the plaintiff's own expert witnesses had acknowledged that the City both had relevant policies in place and had trained Officer Guerra and his colleagues on those policies. *Id.* at 19. The court then emphasized that — without criticizing the policies or the training — the

31

plaintiff's experts simply opined that Guerra and the other responding officers disregarded their training and violated the City's policies in their encounter with Galindo. *Id.* at 19-20.

Consistent with its Opinion, the district court awarded summary judgment to the defendants on each of the claims against them — to Officer Guerra on the Fourth Amendment, assault and battery, wrongful death, and negligent infliction of emotional distress claims, and to the City on the wrongful death, negligent infliction of emotional distress, and negligent training claims. Having done so, the court denied the plaintiff's cross-motion for partial summary judgment. The plaintiff has timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo district court decisions on motions for summary judgment and qualified immunity. *See Franklin v. City of Charlotte*, 64 F.4th 519, 529 (4th Cir. 2023). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When cross-motions for summary judgment are before us, we "examine[] each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (internal

quotation marks omitted). Applying that standard, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the nonmoving party. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). That means "we may not credit [the movant's contrary] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor," even if "a jury could well believe the evidence forecast by the [movant]." *See Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 579 (4th Cir. 2017).

III.

On appeal, the plaintiff contests the district court's awards of summary judgment to Officer Guerra and the City of Charlotte on all her claims, and she renews her own request for partial summary judgment. As previously stated, we are satisfied to affirm the summary judgment award to the City on the negligent training claim. We vacate, however, the award of qualified immunity to Guerra on the Fourth Amendment claim, as well as the summary judgment awards to Guerra and the City on the assault and battery, wrongful death caused by negligence, and negligent infliction of emotional distress claims. Because there are genuine disputes of material fact as to the objective reasonableness of Guerra's actions, we remand for further proceedings on each of those claims, without directing the entry of a judgment in the plaintiff's favor.

A.

We first address the plaintiff's Fourth Amendment claim against Officer Guerra, brought under 42 U.S.C. § 1983 for the alleged use of excessive force. Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges

33

a right arising under the Constitution or laws of the United States." *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Law enforcement officers sued in their individual capacities under § 1983 may invoke the doctrine of qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity is designed to "protect[] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (internal quotation marks omitted).

As the district court recognized, the qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *See Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). If the answer to either question is "no," the officer being sued is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232. Courts possess discretion concerning which prong to address first. *Id.* at 236. In reviewing an award of qualified immunity to a defendant officer at the summary judgment stage, our job is to "consider whether there are any material disputes of fact . . . that, when resolved, would amount to the violation of a clearly established constitutional right." *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). "If there are, summary judgment is inappropriate." *Id.*

34

1.

We begin, as did the district court, with the first prong of the qualified immunity analysis: here, whether — viewing the facts in the light most favorable to the plaintiff — Officer Guerra may have contravened the Fourth Amendment by employing excessive force when he fatally shot Ruben Galindo. On the premise that Guerra's use of deadly force was objectively reasonable, the district court concluded that there was no constitutional violation and thus that Guerra is entitled to qualified immunity.

a.

(1)

Pursuant to the Supreme Court's precedent in *Graham v. Connor*, any claim "that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *See* 490 U.S. 386, 395 (1989). In conducting that analysis, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Moreover, the analysis "requires careful attention to the facts and circumstances of each particular case," including "whether the suspect poses an immediate threat to the safety of the officers or others," as well as "the

35

severity of the crime at issue" and whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Where deadly force has been used, the *Graham* factor of whether the suspect posed an immediate threat "is particularly important." *See Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023). In such cases, this Court considers whether a reasonable officer on the scene would have had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *See Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). We assess the objective reasonableness of an officer's use of deadly force "based on the totality of the circumstances," *see Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017) (citing *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016)), "and based on the information available to the [officer] 'immediately prior to and at the very moment [he] fired the fatal shots,'" *id.* (quoting *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991)).

It has long been "established in this circuit that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed." *See Waterman*, 393 F.3d at 481 (citing *Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996))*; see also Betton v. Belue*, 942 F.3d 184, 191 (4th Cir. 2019) ("We assess the reasonableness of the officer's conduct based on the circumstances confronting the officer immediately prior to and at the very moment he fired his weapon." (internal quotation marks omitted)). As such, we have recognized "that force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *See Waterman*, 393 F.3d at 481. That is, our reasonableness

"determination must focus on the moment that deadly force was used, not the whole episode," and we must be mindful that "the justification for deadly force can fall away in seconds." *See Stanton*, 25 F.4th at 233.

(2)

In our 2013 decision in *Cooper v. Sheehan*, we clarified when a reasonable officer is — and is not — entitled to use deadly force against an armed suspect. *See* 735 F.3d at 159. Specifically, we explained that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Id.* "Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.* "Instead," as we illuminated, "deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is *threatened* with the weapon." *Id*.

We recognized in *Cooper* that "there are many circumstances under which a police officer could reasonably feel threatened," such that the use of deadly force would be permissible. *See* 735 F.3d at 159 n.9. Those circumstances include, of course, when a firearm-brandishing suspect "point[s], aim[s], or fir[es] his weapon." *Id.*; *accord Elliott*, 99 F.3d at 642-44 (concluding that a fatal police shooting was justified where the handcuffed suspect had grasped a handgun, pointed it at officers with his finger on the trigger, and ignored an officer's directive to drop the firearm). To be sure, "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." *See Cooper*, 735 F.3d at 159 (quoting *Elliott*, 99 F.3d at 644).

37

The circumstances under which a police officer could reasonably feel threatened also include when a suspect who is armed, or mistakenly believed to be armed, makes some other threatening movement. As examples of those circumstances, *Cooper* identified three of our earlier cases: *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001), wherein "the officers ordered a detainee to his hands and knees, and then shot him when he reached for a bulge in his waistband that turned out to be a radio"; *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994), wherein "a bystander was shot as he ran toward a police officer moments after the officer learned that an armed arrestee was on the loose in the area"; and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991), wherein "an officer shot a suspect who ignored commands to show his hands before turning quickly toward the officer with what turned out to be only a beer bottle in a clinched fist." *See Cooper*, 735 F.3d at 159; *see also Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (recognizing that police officers reasonably felt threatened by a suspect who — after wielding a knife and issuing threats against the officers and others — walked toward the officers, appeared to still be armed, and disobeyed commands to stop).

As we explained in *Cooper*, deadly force has been deemed constitutionally permissible where "the objective basis for the threat was real, but the [suspect's weapon] was not." *See* 735 F.3d at 159. Crucially, however, deadly force has proven to violate the Fourth Amendment where the suspect's weapon "was real," but "the threat was not." *Id.*

Moreover, although *Cooper* and the decisions that preceded it reflect that deadly force may be allowable where a suspect has ignored or defied a police officer's commands,

38

those precedents establish that noncompliance alone is an insufficient justification.  Under those precedents,

> the failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*See Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022) (summarizing *Cooper*, *Anderson*, *Sigman*, *Elliott*, *McLenagan*, and *Slattery*, plus this Court's post-*Cooper* decision in *Hensley*).  Our precedents further reflect that, in order for deadly force to be justified, the commands defied by the suspect must have been "*clear* commands."  *See Franklin*, 64 F.4th at 533 (citing *Elliott*, *Slattery*, and *Hensley*).

(3)

Applying the foregoing principles in *Cooper*, we concluded that it was not objectively reasonable for law enforcement officers to fire on a suspect holding a shotgun, in that the evidence showed, inter alia, that the muzzle of the shotgun was "pointed at the ground" and the suspect "made no sudden moves" or "threats" and "ignored no commands."  *See* 735 F.3d at 159.  As we put it, "the facts fail[ed] to support the proposition that a reasonable officer would have had probable cause to feel threatened by [the suspect's] actions."  *Id.*  Since *Cooper*, we have similarly and repeatedly ruled that it was not objectively reasonable for officers to fire on suspects who, though armed, were not threatening the officers or others with their weapons at the moment they were shot.  *See Hensley*, 876 F.3d at 583 (suspect kept a "handgun pointed toward the ground at all times," "never raised the gun to the officers," and "never otherwise threatened them"); *Betton*, 942

39

F.3d at 192 (suspect "was holding a firearm 'down'" by his hip and had no opportunity to raise it); *Knibbs*, 30 F.4th at 217 (suspect was "holding a loaded shotgun that was not aimed at [the officer]" and had not "made any furtive movement towards [the officer] that would indicate his intent to cause physical harm"); *Franklin*, 64 F.4th at 533-34 (suspect "pointed [his handgun] at no one" and "held it with just one hand from the top of the barrel," such that he "would have had to reposition his grip to become a threat").

In those cases, we were reviewing the grant or denial of qualified immunity to the defendant officers at the summary judgment stage, and we thus viewed the facts in the light most favorable to the plaintiffs.[7] Consequently, we disregarded contrary evidence proffered by the defendants, including sworn statements that certain suspects had actually pointed their firearms at the officers just before the officers shot those suspects. *See, e.g.*, *Hensley*, 876 F.3d at 579 (explaining that "we may not take as true the [officers'] assertion that [the suspect] had the muzzle of the gun pointed toward them in a 'shoot-from-the-hip' position").

Moreover, we highlighted additional circumstances that — if found by a jury — would undermine the officers' claims that they reasonably felt threatened by the suspects and their weapons. For example, in *Cooper*, it was apparent that the suspect had a

---

[7] In the cases wherein qualified immunity had been denied, we were also required to accept the facts as viewed by the district court. *See, e.g.*, *Cooper*, 735 F.3d at 157 (recognizing that our jurisdiction under the collateral order doctrine was limited to the "claim that there was no violation of clearly established law accepting the facts as the district court viewed them" (quoting *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc))).

"perfectly reasonable rationale" for being armed: The officers had gone onto the suspect's property at night without announcing their presence or identifying themselves. *See* 735 F.3d at 160 (internal quotation marks omitted). Nevertheless, without giving any commands or having any "information suggesting that [the suspect] might harm them," the officers "fired on [the suspect while] he stood at the threshold of his home." *Id.* at 159. Similarly, in *Betton*, the officers made a violent, unannounced entry into the suspect's residence and then "fired 29 shots without warning or issuing any commands." *See* 942 F.3d at 192. And in *Knibbs*, the officer knocked on the suspect's door and announced himself, but he was not "readily recognizable as a law enforcement officer in the middle of the night on [the] unlit porch." *See* 30 F.4th at 217. The suspect thus "racked his shotgun in order to load it while investigating who was on his porch" and understandably ignored two commands to drop the firearm, without aiming his shotgun at the officer or making any furtive movements before the officer shot him through a window. *Id.* at 220-21.

In *Hensley*, although the officers had witnessed the suspect striking his daughter with his handgun on the front porch of his home, that "brief altercation" had ended with the suspect walking away from his daughter into his yard and thereafter making "no threatening statements or actions toward anyone." *See* 876 F.3d at 583-84. Meanwhile, the officers never spoke to the suspect and "never ordered [him] to drop the gun or warned that they would shoot." *Id.* at 585. Rather, the officers "opened fire on [the suspect] and killed him," apparently for the simple reason that "he had possession of a firearm." *Id.* at 583.

Most recently, in *Franklin*, the officers "receiv[ed] 911 accounts of a man terrorizing people [with a handgun] at a fast-food restaurant." *See* 64 F.4th at 532. But "the officers arrived at a very different scene than the one described in those reports," in that the suspect "was no longer inside the restaurant" and no longer being "aggressive or outwardly threatening." *Id.* Instead, the suspect was "crouched down next to the [open] passenger side of a Honda sedan parked in the restaurant parking lot," about a foot away from and facing a restaurant employee who was sitting in the passenger seat. *Id.* at 525-26. As the officers had been advised as they were en route to the scene, the restaurant employee had been "calming [the suspect] down" and "pray[ing] with him." *Id.* at 526 n.1.

Notably, video footage from the officers' body cameras showed how their ensuing encounter with the suspect unfolded. *See Franklin*, 64 F.4th at 526. Upon arrival, while approaching the suspect and before they could see him, the officers shouted four commands for the suspect to show his hands, without being able to visually ascertain whether the suspect was complying. *Id.* Once the suspect came into one officer's view, the suspect's handgun was out of sight and his "hands appeared to be clasped together between his legs." *Id.* The officers then yelled 22 commands for the suspect to drop his firearm. *Id.* at 526-27, 532. In the midst of those commands, another "restaurant employee felt comfortable enough to walk up to [the suspect]," only to be ordered by the officers "to get back." *Id.* at 526, 532. The commands were so loud and frequent that the officers could not hear whether the suspect said anything back to them. *Id.* The suspect did not immediately comply with the commands and retained what appeared to be a "passive" demeanor. *Id.*

42

As it turned out, the suspect had not — as the officers "apparently assumed" — been holding his firearm in his hands when commanded to drop the weapon. *See Franklin*, 64 F.4th at 532. Rather, the suspect's "gun was concealed under his jacket, not in his hands." *Id.* Thus, "the only way for him to obey the officers' commands to drop the gun was to reach into his jacket to retrieve it." *Id.* "When he did just that," however, the one officer who could see the suspect "interpreted his movement as a threatening maneuver." *Id.* Although the suspect then held his handgun "in a non-firing grip, pointed away from everyone," the officer promptly shot the suspect twice and killed him. *Id.*

In those circumstances, we concluded that a reasonable jury could find that the fatal shooting "rested on [the suspect's] 'mere possession of a firearm.'" *See Franklin*, 64 F.4th at 532 (quoting *Cooper*, 735 F.3d at 159). That was due, in part, to "the non-threatening way [the suspect] handled the weapon once he retrieved it." *Id.* at 534. It was also because — "observing the facts in the light most favorable to [the plaintiff] — there was nothing furtive or menacing about [the suspect's] response to the officers' commands." *Id.* at 532. Indeed, the officers' "commands simply were too ambiguous to transform [the suspect's] hesitation into recalcitrance." *Id.* at 533 (recapping that, "after demanding to see [the suspect's] hands, the officers then pivoted to an inconsistent instruction, ordering him to drop his gun"). As we explained, when the suspect "hesitated through twenty-some-odd commands as if contemplating something," he may have been "deciding how to drop a gun he was not holding" or he may have been "just frightened by the torrent of shouting and gun-pointing." *Id.* (internal quotation marks omitted). We also noted the officers' failure to act in accordance with their training, including their training "to give various commands

43

to achieve specific results precisely because one misjudgment could endanger the officers or the public." *Id.*

Lastly, we related in *Franklin* that — although the district court had ruled in favor of the defendant officer who fatally shot the suspect — the district court recognized that, "in hindsight," the officer likely made a mistake in perceiving the suspect to pose an immediate threat. *See* 64 F.4th at 531-32 (internal quotation marks omitted). In refusing to affirm the district court, we emphasized that "the question [was] whether [the officer's] mistake was *reasonable*." *Id.* at 532. Given the evidence, particularly "the body camera footage depicting the encounter," we concluded that a reasonable jury could find that any mistake by the officer was not a reasonable one. *Id.*

b.

Here, viewing the facts in the light most favorable to the plaintiff,[8] Ruben Galindo sought help from police officers because — in the throes of paranoia — he wanted to surrender his pistol and turn himself in for impending court proceedings. Although he was firmly instructed by the Spanish-speaking 911 dispatcher to leave the firearm inside his apartment when he met the responding officers outside, Galindo insisted that he would have the firearm with him. He also denied any plan to harm the officers or anyone else, and he repeatedly asserted that he had no bullets for his pistol. Before they reached

---

[8] Our recitation of the facts in the light most favorable to the plaintiff is drawn from the record before us, including the 911 dispatch records, the video footage from the responding officers' body cameras, the officers' deposition testimony and records of their interviews with police department investigators, and the reports and deposition testimony of the parties' expert witnesses.

44

Galindo's apartment, the responding officers were advised by the dispatcher of both Galindo's assurances that he had no bullets and his intention to "put down the gun" only after the officers arrived. *See* J.A. 313.

Unquestionably, the responding officers had good reason to be skeptical of Galindo and to treat him as a potential threat to the safety of the officers and others. Galindo's purported reason for summoning the officers was dubious, he was refusing to disarm himself, and he was otherwise being uncooperative with the dispatcher and "sound[ing] delusional." *See* J.A. 109. Moreover, he had admitted to consuming alcohol, was suspected of a previous firearm-related offense, and posed a threat not only of ambush to the officers, but also of domestic violence to a "female" inside his apartment. *Id.*

Before proceeding to Galindo's apartment, Officer Guerra recognized that, "to assess the situation accurately," he "would have to do it best in person" and "try to establish an open line of communication [with Galindo] and basically feel him out." *See* J.A. 296. Furthermore, Guerra and the other responding officers had been trained to regard an event like the Galindo event "as a crisis intervention" necessitating "effective communication" and "de-escalation." *Id.* at 693. Notwithstanding that training — and despite that they were not fluent in Spanish, could speak only a few Spanish words, and could only presume that Galindo would be able to understand simple English phrases — the officers decided to proceed to Galindo's apartment without awaiting the assistance of a Spanish-speaking colleague. Even then, the officers' training would have had them calmly asking Galindo if he spoke English, conveying their intent to help him, non-threateningly asking him to

45

lay his pistol on the ground, and using recognizable physical gestures in lieu of English words and phrases that Galindo may not have understood.

Instead, Officer Guerra greeted Galindo with a Spanish command of "manos" ("hands"), rather than the more precise "manos arriba" ("put your hands up"), albeit with a physical gesture demonstrating to Galindo what he should do. When Galindo then raised his left hand and showed himself to be holding the pistol that he had advised he would have with him, Guerra and the other responding officers immediately shouted English commands — neither calmly nor non-threateningly — to "drop the gun" and "put it down." Those commands, unlike the "manos" command, were not accompanied by any physical gestures that would illustrate what the officers meant.

In the midst of the Spanish and then English commands, Galindo demonstrated uncertainty as to whether he should throw his pistol or continue holding it in his raised left hand. He also demonstrated that he was trying to understand and comply with the officers' instructions. Quickly, Galindo assumed a position of surrender, with both his arms raised above shoulder height and about 45 degrees from the center of his body. Galindo's left arm was pointing toward the wall of the apartment building across from his own, away from Officer Guerra and his colleagues. Galindo was holding the pistol upside down, with the grip pinched between his thumb and fingers. Although he could have fired the pistol while holding it in that position, he could not have done so accurately. Moreover, Galindo never pointed his pistol toward Guerra or another officer, and no other person was present. Galindo also did not make any movement suggesting that he was about to fire the pistol. Rather, Galindo remained frozen in his position of surrender until he fell as a result of the

first of the two shots fired at him by Guerra.  Throughout the encounter, Guerra's rifle had been aimed at Galindo, Guerra had backup from his colleagues, and cover had been available to all the officers, with only Guerra choosing to step away from his.

Two days later, during his interview with police department investigators, Officer Guerra gave an account of the fatal shooting in which he asserted the following:  that he had greeted Galindo with the Spanish command "manos arriba"; that, in response, Galindo raised both his arms and only then lowered his left arm, reached into his pocket, and pulled out his pistol; that Galindo pivoted the pistol and pointed it toward Guerra just before Guerra fired his rifle at Galindo; and that Galindo remained standing after Guerra's first shot, such that Guerra was compelled to fire the second.  Following the interview, however, the video footage from the responding officers' body cameras was shown to either flatly refute or at least fail to corroborate each of those assertions.

Somewhat undeterred, Officer Guerra continued to claim during his deposition that Galindo raised then lowered his left arm to reach into his pocket to retrieve his pistol, and that he pivoted the pistol toward Guerra after subsequently taking his position of surrender.  Guerra has also endorsed the deposition testimony of Officer Tran-Thompson that, just before being shot, Galindo took a small step toward Guerra and began to lower his left arm or elbow in such a way that he appeared to be "getting ready to punch out and take a shooter's stance."  *See* J.A. 619.  Tran-Thompson's account, however, varies from Guerra's account and also lacks corroboration in the video footage.  Additionally, although Guerra asserted in his police department interview and subsequent deposition that Galindo was holding his pistol in a shooter's position — i.e., "high and firm with a pistol grip," *id.* at

47

317 — that assertion has been contradicted by Officer Batson's statements that Galindo was less-threateningly holding the pistol upside down, with the grip pinched between his thumb and fingers.

In his statements, Officer Guerra has confirmed that he had a clear view of Galindo and his pistol throughout the encounter. Guerra has also proposed that differences between his account of the fatal shooting and those of other officers on the scene — as well as differences between his account and the video footage from the other officers' body cameras — are the result of the officers' varying vantage points. *See, e.g.*, J.A. 335 (suggesting that, because his vantage point was better lit and closer than Officer Batson's, he was in superior position to discern how Galindo's pistol was actually being held). Furthermore, it is generally undisputed in these proceedings that the video footage is not clear in all details and did not capture everything that occurred at the shooting scene.

c.

Under the foregoing view of the facts — which, again, is necessarily in the light most favorable to the plaintiff — Galindo posed a threat to the safety of the responding officers at the moment he was shot, but a reasonable officer on the scene would not have had probable cause to believe that he posed an "immediate threat" such that deadly force could constitutionally be used against him. *See Graham*, 490 U.S. at 396; *Waterman*, 393 F.3d at 477. Simply put, Officer Guerra fired at Galindo while Galindo was standing still in a position of surrender. Although Galindo was armed with a pistol, he did not threaten anyone with the pistol by "pointing, aiming, or firing his weapon." *See Cooper*, 735 F.3d at 159 n.9. And although Galindo failed to obey the officers' English commands to "drop

48

the gun" and "put it down," he made no "furtive or other threatening movement with the weapon" that would have signaled an "inten[t] to use it in a way that imminently threaten[ed] the safety of [Guerra] or another person." *See Knibbs*, 30 F.4th at 225.[9]

Indeed, the Spanish-speaking Galindo may not have even understood the English commands to "drop the gun" and "put it down." He seemed to want to comply with the officers' instructions, while being confused by what they were commanding. As we have explained, a suspect's failure to obey commands may not justify deadly force if the commands were unclear. *See Franklin*, 64 F.4th at 533 (observing that "our cases support [the] position that if [the suspect] defied *clear* commands, then his actions may have provoked deadly force").

Moreover, although it may not have been "perfectly reasonable," Galindo had a "rationale" for being armed: In a state of paranoia, he wanted to surrender his pistol and turn himself in for impending court proceedings. *Cf. Cooper*, 735 F.3d at 160 (recognizing suspect's "perfectly reasonable rationale" for being armed, i.e., officers' unannounced nighttime incursion on his property (internal quotation marks omitted)). Galindo so advised the Spanish-speaking 911 dispatcher, who in turn informed the responding officers

---

[9] We focus herein on the *Graham* factor of whether the suspect posed an immediate threat because, where deadly force has been used, it "is particularly important." *See Franklin*, 64 F.4th at 531. In any event, due to the facts of this case, the other factors specified in *Graham* — "the severity of the crime at issue" and whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," *see* 490 U.S. at 396 — are "not particularly germane to our analysis." *See Knibbs*, 30 F.4th at 215-16 (concluding same where the defendant officer "was only trying to investigate a dispute between neighbors that may have involved an attempted misdemeanor property crime").

that Galindo planned to "put down the gun" only after the officers arrived outside his apartment. *See* J.A. 313. The dispatcher also relayed to the officers that Galindo had given assurances that he had no bullets. That is not to say that the officers were obliged to believe Galindo or trust that he was not dangerous. But the fact that Galindo disclosed that he would be carrying the pistol so that he could surrender it, as well as the fact that Galindo affirmatively indicated that he intended the officers no harm, can be seen as further weakening the case for probable cause to believe that Galindo posed an immediate threat. *Cf. Sigman*, 161 F.3d at 787 (including in probable cause analysis that suspect had recently wielded knife while issuing verbal threats against officers and others).

It also may be deemed significant that Officer Guerra and his colleagues went into the Galindo event knowing that it should be treated "as a crisis intervention" with a person who "sound[ed] delusional," and knowing that they therefore needed "to establish an open line of communication" with someone who spoke Spanish and may have understood no English. *See* J.A. 109, 296, 693. Yet they proceeded to confront Galindo without the assistance of a Spanish-speaking officer, and they otherwise disregarded their training on how to properly interact with non-English speakers and persons suffering from mental illness. *See Franklin*, 64 F.4th at 533 (noting officers' failure to follow their training to issue clear commands).

Viewing the video footage and the other evidence in the light most favorable to the plaintiff, it may further be concluded that Officer Guerra's account of the fatal shooting was either contrived or unreasonably mistaken. *See Franklin*, 64 F.4th at 532 (recognizing that deadly force will be justified where officer erroneously perceived immediate threat

only if "mistake was *reasonable*"). That is, at this stage of the proceedings, Guerra's account cannot be credited, nor can inaccuracies in his account be excused as innocent misperceptions. *See id.* at 529-30 (underscoring that, in considering a request for qualified immunity made by summary judgment motion, "[w]e may not credit [the movant's] evidence, weigh the evidence, or resolve factual disputes in the [movant's] favor" (quoting *Hensley*, 876 F.3d at 579)).

At bottom, a reasonable jury could review and interpret the video footage, consider the other evidence, and decide that Galindo did not pose an immediate threat to Officer Guerra or anyone else at the moment Guerra shot him. A reasonable jury could also find that Guerra fabricated his account of the fatal shooting because he knew that the real facts showed that the shooting was not justified. Or a reasonable jury could find that Guerra mistakenly perceived that Galindo posed an immediate threat, but that Guerra's mistake was not reasonable. As such, it very well may be concluded that Guerra used excessive force in contravention of the Fourth Amendment, meaning that he is not presently entitled to qualified immunity under the first prong of the qualified immunity analysis.

d.

In ruling to the contrary, the district court erred. As an initial matter, the court rendered its own interpretation of the video footage from the responding officers' body cameras and failed in several instances to view the facts in the light most favorable to the plaintiff. For example, the court declared that the video footage shows that "Galindo's left hand began to drop just before shots were fired" — something not even Officer Guerra has claimed — and it dismissed the video footage from the body cameras of Officers Batson

and Suggs as being from "a view that cannot be the view of a reasonable officer in Guerra's position." *See* Opinion 5, 10.

Because one of the few important things that is undisputed about the video footage is that it is not clear in all details and did not capture everything that occurred at the shooting scene — and because our own review of the video footage has confirmed that it is subject to different interpretations — neither the district court nor this Court is permitted to decide at the summary judgment stage of these proceedings what the video footage shows or what it did not capture. Like ours, the role of the district court is limited to viewing the facts in the light most favorable to the plaintiff and leaving material factual disputes to be resolved by a jury. *See Hensley*, 876 F.3d at 579 (explaining that, under the summary judgment standard, we may not "weigh the evidence" or "resolve factual disputes").

Its error in improperly viewing the facts aside, the district court ultimately ruled in favor of Officer Guerra based on the uncontested evidence "that Galindo ignored the [Spanish-speaking dispatcher's] directive to leave the gun in the house and in response to the officer's command 'manos,' . . . drew [the] gun." *See* Opinion 12. According to the court, once Galindo brandished his pistol, Guerra was immediately entitled to use deadly force against him because he posed an immediate threat to the responding officers by being "a non-compliant, armed subject." *See id.* at 11, 13. In other words, the court concluded that the fatal shooting was justified because of Galindo's conduct before he assumed a position of surrender and then allegedly pivoted his pistol toward Guerra and indicated he was about to fire.

The district court's theory is at odds, however, with the well-established principle "that the reasonableness of an officer's actions is determined based on the information possessed by the officer at the moment that force is employed," so that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *See Waterman*, 393 F.3d at 481. Even accepting that deadly force was justified at the moment Galindo brandished his pistol, that justification would have vanished once Galindo assumed his position of surrender.

Additionally, the district court's theory disregards our precedents that deadly force cannot be used simply because a suspect is armed and has ignored commands. To be sure, the decisions invoked by the district court — *Anderson*, *Sigman*, and *Slattery* — stand for the legal principle "that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *See* Opinion 11 (quoting *Anderson*, 247 F.3d at 131). But those and other decisions make clear that there must be some basis, other than a suspect's mere possession of a weapon and failure to obey commands, for the officer to reasonably feel threatened. That is, the suspect must "make[] some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." *See Knibbs*, 30 F.4th at 225 (summarizing *Anderson*, *Sigman*, and *Slattery*, as well as *Cooper*, *Elliott*, *McLenagan*, and *Hensley*). Here, the allegation is that Galindo made such a furtive or threatening movement with his pistol only after taking the position of surrender.

In these circumstances, the district court erred in concluding at the summary judgment stage that Officer Guerra's use of deadly force was objectively reasonable, such that no Fourth Amendment violation occurred. Consequently, the court erred in awarding qualified immunity to Guerra under the first prong of the relevant analysis.

e.

Although we conclude that Officer Guerra is not presently entitled to qualified immunity under the first prong of the qualified immunity analysis, we also rule that the plaintiff is not entitled to summary judgment on her Fourth Amendment claim. In seeking such relief, the plaintiff has largely relied on the video footage from the responding officers' body cameras, arguing that the video footage is sufficiently unambiguous both to "quite clearly establish that Galindo was not a threat to anyone at the moment Guerra killed him" and to "blatantly contradict[]" Guerra's account of the shooting. *See* Br. of Appellant 22 (internal quotation marks omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (recognizing that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

We cannot agree with the plaintiff that the video footage is unambiguous enough either to prove the lack of an immediate threat or to wholly discredit Officer Guerra's version of events. As the plaintiff has not disputed, the video footage is inconclusive as to key issues such as how Galindo was holding his pistol and where the pistol was pointing. Moreover, it is generally agreed that the video footage did not capture everything that

occurred at the shooting scene, rendering it possible that, just before Guerra shot him, Galindo made threatening movements that the video footage does not show.  Thus, the video footage provides only "*some* support" to the plaintiff, and it does not compel an award of summary judgment in her favor.  *See Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (observing that "*Scott* does not hold that courts should reject [the nonmoving party's] account on summary judgment whenever documentary evidence, such as a video, offers *some* support for [the movant's] version of events").

It bears emphasis that — although a reasonable jury could rule in favor of the plaintiff after reviewing the video footage and other evidence — a reasonable jury could instead find that Galindo did pose an immediate threat at the moment Officer Guerra fatally shot him or that Guerra was reasonably mistaken in perceiving an immediate threat.  We therefore decline to direct the entry of a judgment in the plaintiff's favor on her Fourth Amendment claim.

2.

That brings us to the second prong of the qualified immunity analysis with regard to the Fourth Amendment claim:  whether the constitutional right allegedly violated was clearly established in September 2017 when Officer Guerra fatally shot Galindo.  In light of its ruling in Guerra's favor under the first prong, the district court did not reach this issue.  We address it, however, because if the right was not clearly established, Guerra would yet be entitled to qualified immunity and we would have an alternative ground for affirming the district court.

55

In assessing whether a right was clearly established, we look to decisions of the Supreme Court and this Court to "consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights." *See Betton*, 942 F.3d at 193-94. "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (internal quotation marks omitted). Nevertheless, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *See Wilson v. Prince George's Cnty.*, 893 F.3d 213, 221 (4th Cir. 2018).

Here, the question is whether it was clearly established in September 2017 that an officer would contravene the Fourth Amendment by using deadly force against a suspect who is holding a firearm in his hand and ignoring commands to drop the weapon, but who is standing still in a position of surrender, is not firing the weapon or aiming it at any person, and is not otherwise making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else. The answer is plainly "yes" under our 2013 decision in *Cooper*, as well as our earlier decisions in *Anderson* (2001), *Sigman* (1998), *Elliott* (1996), *McLenagan* (1994), and *Slattery* (1991).

Precisely on point, we have held that those six decisions — along with our November 2017 decision in *Hensley* — "together *clearly establish*" the following:

56

> [T]he failure to obey commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

*See Knibbs*, 30 F.4th at 225 (emphasis added); *see also Franklin*, 64 F.4th at 534-35 (explaining that we had "little trouble concluding that [the suspect's] Fourth Amendment right was clearly established by our precedents," including *Cooper* and *Hensley*). That is, we not only have decisions that clearly establish the very right at issue in these proceedings, but we also have decisions that already recognize the right was clearly established under the earlier precedents.

Notably, Officer Guerra — who bears the burden of proof under the second prong of the qualified immunity analysis, *see Stanton*, 25 F.4th at 233 — does not argue that the aforementioned right did not become clearly established until we decided *Hensley*, two months after he fatally shot Galindo. And there is good reason for that, as it is not *Hensley* that clearly established the right. At best, *Hensley* simply made even clearer the right that was clearly established by *Cooper*, *Anderson*, *Sigman*, *Elliott*, *McLenagan*, and *Slattery*.

Officer Guerra is thus left to assert that a different right is at issue in these proceedings — a right that has never been clearly established. Specifically, Guerra maintains that there is no precedent of this Court or the Supreme Court ruling that where an officer is "interacting with a subject who has a gun in his hand which the officer reasonably believes the subject is preparing to fire," and where "the officer has announced his presence and the subject has been commanded repeatedly to disarm," that officer "is not allowed to defend himself, his fellow officers and others with deadly force." *See* Br.

of Appellees 41.  The critical problem for Guerra is that his argument assumes that he shot Galindo based on a reasonable belief that Galindo was about to fire his own pistol, but that is not what the plaintiff contends.

Considering, as we must, the Fourth Amendment right that the plaintiff alleges was violated, we are readily satisfied that the right was clearly established at the time of the September 2017 fatal shooting.  We therefore vacate the district court's award of qualified immunity to Officer Guerra and reinstate the plaintiff's Fourth Amendment claim for further proceedings.

B.

We next address the plaintiff's state law claims against Officer Guerra for assault and battery, and against both Guerra and the City of Charlotte for wrongful death caused by negligence and negligent infliction of emotional distress.  The district court awarded summary judgment to the defendants on those claims, based on its conclusion with respect to the Fourth Amendment claim that Guerra's use of deadly force was objectively reasonable.  As we have explained, however, there are genuine disputes of material fact as to the objective reasonableness of Guerra's actions.  Thus, as with the Fourth Amendment claim, we reinstate the assault and battery, wrongful death, and negligent infliction of emotional distress claims for further proceedings, without directing the entry of judgment in the plaintiff's favor as to any of the claims.

C.

Finally, we address the plaintiff's state law claim against the City of Charlotte for negligent training police officer training.  The district court awarded summary judgment to

58

the City on the negligent training claim because of the plaintiff's failure to produce evidence sufficient to establish any alleged training failure. In so doing, the court observed that the plaintiff's own expert witnesses acknowledged that Officer Guerra and his colleagues received appropriate training from the City, as the plaintiff's experts blamed the officers for disregarding their training and did not criticize the training itself. Despite that evidence, the plaintiff suggests that negligent training can somehow be inferred from the officers' conduct, particularly their decision to approach Galindo without the assistance of a Spanish-speaking officer. We agree with the district court, however, that there is an insufficient evidentiary basis for the negligent training claim, and we therefore affirm the summary judgment award to the City as to that claim.

## IV.

Pursuant to the foregoing, we affirm the district court's summary judgment award to the City of Charlotte on the plaintiff's negligent training claim. We vacate the court's award of qualified immunity to Officer Guerra on the Fourth Amendment claim, as well as the related summary judgment awards to Guerra and the City on the assault and battery, wrongful death caused by negligence, and negligent infliction of emotional distress claims. We remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*

RICHARDSON, Circuit Judge, dissenting:

In its fifty-seven-page opinion, the majority devotes a mere three pages to whether Officer Guerra violated clearly established law. Its brevity is telling. While the law may be established now, we must consider the law as it stood when Galindo was shot in September 2017. And the law at that time did not clearly establish that Officer Guerra violated the Fourth Amendment.

Determining whether an official violates clearly established law is a two-step process. We first must specifically define the right. *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). Then, based on that right, we look to see if caselaw at the time of the conduct places the constitutional question "beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). "It is not enough that the rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Bond*, 142 S. Ct. at 11 (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)) (internal quotation marks omitted). This does not require an existing case directly on point. But it does demand that officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullinex v. Luna*, 577 U.S. 7, 13 (2015)). This clarity requires an *existing* "body of relevant case law" that actually *finds* "a Fourth Amendment violation

'under similar circumstances.'"[1]  *Wesby*, 138 S. Ct. at 590–91 (first quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004), and then quoting *White*, 580 U.S. at 79).

It is here that the majority goes astray.  Even were one to accept its definition of the right,[2] the majority does not identify a single case published before this September 2017 shooting—let alone a "body of relevant case law"—"finding a Fourth Amendment violation under similar circumstances."  *Wesby*, 138 S. Ct. at 590–91.  Its conclusory analysis instead relies on cases after the shooting and cases finding *no* violation.

The majority rests on our decisions in *Knibbs v. Momphard*, 30 F.4th 200 (2022), and *Franklin v. City of Charlotte*, 64 F.4th 519 (4th Cir. 2023).  But both were decided well after the shooting here, so they could not be part of the law that was clearly established by September 2017.  *Wesby*, 138 S. Ct. at 589 ("To be clearly established, a legal principle must have a sufficiently clear foundation in *then-existing* precedent." (emphasis added)); *Kisela*, 138 S. Ct. at 1154 (finding a case decided after the shooting at issue was of no use in the clearly established inquiry).  To get around this problem, the majority reads *Knibbs* to say that our pre-shooting caselaw clearly established the right.  The majority says that

---

[1] There is an exception—which the majority doesn't purport to rely on—for when the constitutional violation is "obvious . . . even though existing precedent does not address similar circumstances."  *Wesby*, 138 S. Ct. at 590.

[2] The majority defines the question as "whether it was clearly established in September 2017 that an officer would contravene the Fourth Amendment by using deadly force against a suspect who is holding a firearm in his hand and ignoring commands to drop the weapon, but who is standing still in a position of surrender, is not firing the weapon or aiming it at any person, and is not otherwise making a furtive or threatening movement that would suggest he had an intent to use the weapon to harm the officer or anyone else."  Majority Op. at 56.

the right at issue in *Knibbs* is the same as the one at issue here. And—according to the majority—*Knibbs* said that right was clearly established "under . . . earlier precedents." Majority Op. at 57.

But *Knibbs* doesn't say that. *Knibbs* lists seven cases that it says "together" clearly establish the right *as of April 2018*. *Knibbs*, 30 F.4th at 224–25. One of those cases, *Hensley*, was decided after Galindo's shooting. Nor can the majority reasonably rely on *Hensley* as holding that the right was, prior to that decision, clearly established, because *Hensley* expressly refused to consider whether any right was clearly established.[3] 876 F.3d at 580. So *Knibbs* doesn't say that our pre-shooting cases clearly establish the right; it says our pre-shooting cases *plus one post-shooting case* do. And if it takes all seven cases "together" to clearly establish the right, and the majority can't rely on all seven, then the majority can't rely on *Knibbs*. This is especially true in relation to *Hensley*, which the *Knibbs* majority said "applied [the] right more directly to the particular situation presented in this appeal" than did any of the other cases discussed. *Id.* at 224; *see also Franklin*, 64 F.4th at 531, 535 (including *Hensley* as an important part of the analysis). In fact, *Knibbs* is a better case for Officer Guerra since it implies that the majority with its six cases comes up one short.

The majority speeds right past this hole in its logic, pausing only to half-heartedly assert that "*Hensley* simply made even clearer the right that was clearly established" by the

---

[3] We specifically noted in *Hensley* that the officers "failed to raise—and, therefore, have waived—any argument that the right at issue was not clearly established." *Id.* at 580. So the only question was whether a constitutional violation occurred. *Id.* at 580–81.

other six cases.  Majority Op. at 57.  But now the majority is adding its gloss to *Knibbs's*

gloss.  And if our precedent needs that many coats to paint a right as clearly established,

it's obvious that right was never clearly established at all.

Plus, the majority's gloss isn't even correct.  Without *Knibbs*, *Franklin*, or *Hensley*,

and looking only to the caselaw that existed in September 2017, *see Wesby*, 138 S. Ct. at

589, Officer Guerra is entitled to qualified immunity.  The majority cites six pre-shooting

cases:  (1) *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); (2) *Anderson v. Russell*, 247

F.3d 125 (4th Cir. 2001); (3) *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998);

(4) *Elliot v. Leavitt*, 99 F.3d 640 (4th Cir. 1996); (5) *McLenagan v. Karnes*, 27 F.3d 1002

(4th Cir. 1994); and (6) *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991).  But together or

separately, none of these make it clear to "every reasonable official" that the use of deadly

force in *this* case was *clearly* unlawful.  *Wesby*, 138 S. Ct. at 589.

Start with *Cooper*.  There, we denied qualified immunity when officers shot a man

who stepped onto his front porch carrying a shotgun.  *Cooper*, 735 F.3d at 154–56.  Key to

that holding was the officers' failure to present themselves as law enforcement officials.

*Id.* at 159 ("*Importantly*, the Officers never identified themselves." (emphasis added)).

This failure made their assumption that the man was threatening less reasonable.  *Id.*  But

Officer Guerra identified himself.  So *Cooper* is "simply too factually distinct to speak

clearly to the specific circumstances here."  *Mullenix*, 577 U.S. at 18; *cf. Knibbs*, 30 F.4th

at 224 (noting that *Cooper* only defined the right "at a higher level of generality").

And, to the extent it does speak to these circumstances, *Cooper* actually suggests

that Officer Guerra acted reasonably.  We explained in *Cooper* that, if the officers had

identified themselves, "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Cooper*, 735 F.3d at 159. We also said that "an armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat." *Id.* at 159 n.9. So, after *Cooper*, Officer Guerra might have reasonably assumed he could respond with deadly force to a man approaching him with a drawn weapon. Doubly so since Galindo was in fact drunk, delusional, and had repeatedly ignored commands to leave the firearm in his home. *Cooper* therefore did not put the constitutionality of Officer Guerra's actions "beyond debate." *See Kisela*, 138 S. Ct. at 1152.

The majority's other cases—*Anderson*, *Sigman*, *Elliot*, *McLenagan*, and *Slattery*—are even less helpful. The district court used all but one of them to hold that Officer Guerra did not violate the Fourth Amendment. *Aleman v. City of Charlotte*, No. 3:19-cv-00491, 2021 WL 4495907, at *6–7 (W.D.N.C. Sept. 30, 2021). Officer Guerra argued the same. And Aleman argued that they have "no application here."[4] Appellant's Br. at 32–35. None of them help show that Officer Guerra violated clearly established law.

In *Anderson*, *Sigman*, and *Elliot*, we held the officer's use of deadly force was reasonable. *Anderson*, 247 F.3d at 127; *Sigman*, 161 F.3d at 784; *Elliot*, 99 F.3d at 641. Officer Guerra and the district court could thus be forgiven for thinking they are evidence

---

[4] You might think the majority would be concerned that every actor involved in this litigation disagrees with it. Ordinarily this wouldn't be much of a problem. That others might think us wrong should not stop us from doing what we think is right. But when the question is whether something is beyond debate, it should give us pause when both parties and the district court judge go the other way.

of what a police officer can legally do.  Instead, the majority uses them as evidence of what a police officer *cannot* legally do—presumably on the theory that if Galindo posed less of a threat than the plaintiffs in those cases, then his shooting was unreasonable.  But the Supreme Court has rejected this reasoning:  "[t]he mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here." *Mullenix*, 577 U.S. at 18.  So these cases cannot demonstrate that Officer Guerra violated clearly established law.

What's more, those cases could reasonably be read—like *Cooper*—to support Officer Guerra's position.  In *Anderson* we noted that "[t]his Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."  247 F.3d at 131.  Similarly, in *Elliot* we explained that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences."  99 F.3d at 644.  We also said that "[o]fficers need not be absolutely . . . sure of the nature of the threat or the suspect's intent to cause them harm" before using deadly force.  *Id*.  Given their holdings and dicta, a reasonable officer could look at these cases—where we condoned the use of deadly force against drunk, armed individuals—and infer that Officer Guerra's use of deadly force was reasonable.  So these cases—where there was no constitutional violation at all—do nothing to place the unlawfulness of Officer Guerra's conduct "beyond debate."

*McLenagan* and *Slattery* are no better.  In *McLenagan*, we granted qualified immunity to an officer who shot a handcuffed detainee that was running towards him because another officer was shouting "[t]he [detainee] has got a gun."  27 F.3d at 1005–

65

06.  The officer did not check to see if the detainee was armed or command him to stop.  *Id.* at 1007.  Nor did the detainee move his hands.  *Id.*  Yet we still condoned the officer's use of deadly force:  "We will not second-guess the split-second judgment of a trained police officer merely because that judgment turns out to be mistaken, particularly where inaction could have resulted in death or serious injury to the officer or others."  *Id.* at 1007–08.  I—along with the district court and the parties—fail to see how a reasonable officer would know from *McLenagan* that Officer Guerra's use of deadly force was clearly unlawful.

Lastly, in *Slattery,* we granted qualified immunity to an officer who shot a man who ignored the officer's commands and began reaching for what the officer thought was a weapon.  939 F.2d 215.  We noted that "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful."  *Id.* at 216.  Outside of that statement, there is scant analysis of the qualified immunity issue.  *Id.* at 216–17.  So *Slattery* does not clearly establish that Officer Guerra's conduct was unlawful; it hardly bears on the issue at all.

The point is not that the dicta in these cases is binding, or that officers are entitled to qualified immunity unless we've held otherwise on identical facts.  It's simply that using cases in which there was no constitutional violation at all to show that an officer violated clearly established Fourth Amendment principles is a fraught endeavor.  Such cases might show a constitutional violation, but they are unlikely to put the question "beyond debate."

All told, the majority has "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."  *White*, 580

66

U.S. at 79. It has not shown that—based on our caselaw in September 2017—a reasonable officer would have known that using deadly force in these circumstances was clearly unlawful, beyond debate. Officer Guerra's conduct *at least* falls in the "hazy border" between the unreasonable use of force in *Cooper* and the reasonable uses of force in *Anderson, Sigman, Elliot, McLenagan,* and *Slattery*. *See Mullenix*, 577 U.S. at 18 (quoting *Brosseau*, 543 U.S. at 201). That means he is entitled to qualified immunity. *Wilson v. Prince George's County*, 893 F.3d 213, 223 (4th Cir. 2018).

\*          \*          \*

"Qualified immunity is controversial, contested, and binding." *Stanton v. Elliott*, 25 F.4th 227, 237 (4th Cir. 2022) (cleaned up). While many criticize the doctrine, lower court judges are duty-bound to faithfully apply it so long as it exists. The majority does not. It instead joins the lengthy list of courts of appeals to improperly deny qualified immunity in a Fourth Amendment case.[5] I refuse to join that list and respectfully dissent.

---

[5] *See, e.g.*, *Bond*, 142 S. Ct. 9; *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021); *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019); *Kisela*, 138 S. Ct. 1148; *Wesby*, 138 S. Ct. 577; *White*, 580 U.S. 73; *Mullenix*, 577 U.S. 7; *City and County of San Francisco v. Sheehan*, 575 U.S. 600 (2015); *Plumhoff v. Rickard*, 572 U.S. 765 (2014); *Caroll v. Carman*, 574 U.S. 13 (2014); *Stanton v. Sims*, 571 U.S. 3 (2013); *Ryburn v. Huff*, 565 U.S. 469 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *Brosseau*, 543 U.S. 194.